MARCELLO *v.* BONDS, OFFICER IN CHARGE,
IMMIGRATION AND NATURALIZATION
SERVICE.

No. 145.   Argued April 21–22, 1955.—Decided May 31, 1955.

*Jack Wasserman* and *David Carliner* argued the cause
and filed a brief for petitioner.

*Robert W. Ginnane* argued the cause for respondent. With him on the brief were *Solicitor General Sobeloff, Assistant Attorney General Olney, Maurice A. Roberts* and *L. Paul Winings.*

MR. JUSTICE CLARK delivered the opinion of the Court.

Petitioner, a native of Tunis, Africa, was ordered deported after a hearing pursuant to § 242 (b) of the Immigration and Nationality Act of 1952, 66 Stat. 209, 8 U. S. C. § 1252 (b). It was found that he had been convicted in 1938 of violation of the Marihuana Tax Act, 26 U. S. C. § 2591, and sentenced to imprisonment for one year. Section 241 (a)(11) of the 1952 immigration law [1] makes such conviction *at any time* ground for deportation, and § 241 (d) [2] provides that the deportation provisions of § 241 (a) shall apply even though the facts giving rise to the alien's deportability occurred prior to the date of enactment of the 1952 Act.

At the hearing before a special inquiry officer of the Immigration and Naturalization Service, petitioner did not dispute the fact of his conviction. He did, however, object to the proceedings on the ground that they violated due process and the Administrative Procedure Act, 60 Stat. 237, 5 U. S. C. § 1001 *et seq.* The hearing officer overruled these objections. Petitioner also contended that the *ex post facto* clause of the Constitution precluded the retroactive application of the 1952 law to his case. This contention too was rejected by the hearing officer. Petitioner and his counsel were advised of their right to apply to the Attorney General for the discretionary relief of suspension of deportation under § 244 (a)(5) of the Act.[3] At first they declined to do so, but subsequently

[1] 66 Stat. 204, 8 U. S. C. § 1251 (a)(11).
[2] 66 Stat. 208, 8 U. S. C. § 1251 (d).
[3] 66 Stat. 214, 8 U. S. C. § 1254 (a)(5).

they moved to reopen the hearing to apply for such relief. The special inquiry officer denied the motion. On appeal, the Board of Immigration Appeals affirmed the order of deportation. Though no formal application for suspension of deportation under § 244 (a) (5) had been filed, the Board considered whether such relief was merited but exercised its discretion against the remission.

Petitioner then brought this action for a writ of habeas corpus, challenging the validity of the deportation order on the grounds, *inter alia:* (1) that the hearing under § 242 (b) of the Act failed to comply with the requirements of the Administrative Procedure Act in that the special inquiry officer was under the supervision and control of officials in the Immigration Service who performed investigative and prosecuting functions; (2) that § 242 (b) violated the Due Process Clause of the Fifth Amendment because it failed to provide for a fair and impartial hearing; (3) that on the date of petitioner's arrest the Attorney General made a public statement, which "was bound to have great effect upon the special inquiry officer," to the effect that petitioner was an undesirable citizen for whose deportation the proceedings were "specially designed," and, further, that in 1952 the Attorney General "prepared a list of 152 persons [including petitioner] whom he desired to deport"; and (4) that the retroactive application of § 241 (a) (11) was unconstitutional as an *ex post facto* law.

The Government's return to the writ alleged that petitioner's deportation had been conducted in accordance with the Constitution, laws and regulations of the United States. No evidence was introduced by either side save the official Immigration Service record of petitioner's deportation proceedings. The District Court held the deportation order valid and discharged the writ. 113 F. Supp. 22. The Court of Appeals affirmed. 212 F. 2d 830. Petitioner pursues his four basic objections in this

Court, certiorari having been granted to resolve issues having a significant bearing on the administration of our immigration laws. 348 U. S. 805.

*Applicability of the Administrative Procedure Act.*

Petitioner concedes that § 242 (b) of the Immigration Act, authorizing the appointment of a "special inquiry officer" to preside at the deportation proceedings, does not conflict with the Administrative Procedure Act, since § 7 (a) of that Act excepts from its terms officers specially provided for or designated pursuant to other statutes.[4] He insists, however, that there are several significant discrepancies between the Acts, and claims that in cases of variance the provisions of the Administrative Procedure Act must govern unless those of the Immigration Act "shall . . . expressly" negate their application. Administrative Procedure Act, § 12. The discrepancies relied on stem from the "separation of functions" provision of § 5 (c) of the Administrative Procedure Act. To the extent here material, this section separates investigative and prosecuting functions from those of adjudication, expressly providing that hearing officers shall not be responsible to or under the supervision of those engaged in investigation and prosecution. The section also prohibits the hearing officer from participating or advising in the decision of a case, or one factually related thereto, in which he has performed investigative or prosecuting functions. Section 242 (b) of the Immigration Act, on the other hand, permits the "special inquiry officer" to take the dual role of prosecutor and hearing officer—presenting evidence and interrogating witnesses—and prohibits him only from hearing cases which he has taken some part in inves-

---

[4] Section 7 (a) of the Administrative Procedure Act directs that, in general, administrative hearings shall be held before hearing officers appointed pursuant to § 11 of the Act.

tigating or prosecuting (other than in the permitted dual capacity). An alternative method is permitted by § 242 (b), however, under which an additional immigration officer presents the evidence while the special inquiry officer presides. See 8 CFR § 242.53. Special inquiry officers are subject to such supervision as the Attorney General prescribes, 66 Stat. 171, 8 U. S. C. § 1101 (b)(4), and at present they are subject to the supervision of district directors of the immigration districts to which they are assigned, as well as higher Service officials, all with enforcement responsibilities of the type proscribed by § 5 (c) of the Administrative Procedure Act.

Under the allegations here made, the single attack of the petitioner pertains to the supervision of the special inquiry officer by the investigative and prosecuting officials of the Immigration Service. The alternative procedure of § 242 (b) was employed in this case, so the presiding officer did not undertake the functions of prosecutor; and there is no allegation that he engaged in investigative or prosecuting functions in this or any factually related case. For the sake of clarity, however, we shall consider all of the differences in the hearing provisions of the two Acts in determining whether the Administrative Procedure Act is to govern.

The applicability of the Administrative Procedure Act to deportation proceedings under the Immigration Act of 1917 was considered by this Court in *Wong Yang Sung* v. *McGrath,* 339 U. S. 33 (1950). We there held, contrary to the prevailing interpretation and practice of the Department of Justice, that deportation hearings were subject to the Act. Six months later, Congress provided in the Supplemental Appropriation Act of 1951, 64 Stat. 1048, that proceedings directed toward the exclusion or expulsion of aliens should not be governed by §§ 5, 7 and 8 of the Administrative Procedure Act. The issue here presented is whether the Congress reversed itself in the

1952 Immigration Act and in effect reinstated the *Sung* case by making the hearing provisions of the Administrative Procedure Act directly applicable to deportation proceedings. A comparison of the pertinent provisions of the two statutes is perhaps the strongest indication that the Congress had no such intention.

1. Section 242 (b) of the Immigration Act begins by enumerating the functions of the special inquiry officer, that he shall administer oaths, receive evidence, etc. A similar though more extensive and detailed provision appears in § 7 (b) of the Administrative Procedure Act, but of course this section makes no mention of functions stemming from the special inquiry officer's dual role as prosecutor and judge.

2. Section 242 (b) then directs that a determination of deportability be made only upon the record of a proceeding at which the alien had a reasonable opportunity to be present. A similar direction as to the record appears in § 7 (d) of the Administrative Procedure Act, and as to the party's personal appearance in § 6 (a).

3. Section 242 (b) then deals with matters peculiar to deportation proceedings, which have no direct analogues in the Administrative Procedure Act: safeguards to be established to protect mentally incompetent aliens; the right of the inquiry officer to proceed if the alien deliberately absents himself; the option to pursue the alternative procedure, described above, in which one official prosecutes and another decides.

4. Next in § 242 (b) is the limitation already noted on the special inquiry officer's sitting in the same case in which he has also engaged in investigative or prosecuting functions. The more restrictive analogue in § 5 (c) of the Administrative Procedure Act has also been presented.

5. Section 242 (b) then sets forth various requirements which are to be included in regulations governing deportation proceedings before the special inquiry officer. The

first of these gives the alien the right to reasonable notice of the charges against him and of the time and place at which the proceedings shall be held. A similar requirement appears in § 5 (a) of the Administrative Procedure Act.

6. The second provision which § 242 (b) requires to be included in the regulations is the privilege of the alien to be represented by counsel of his own choosing. Section 6 (a) of the Administrative Procedure Act bestows a similar privilege on any person compelled to appear in person before the agency.

7. The regulations under § 242 (b) must also provide that the alien be given a reasonable opportunity to present and examine evidence and to cross-examine witnesses. The same ground is covered in § 7 (c) of the Administrative Procedure Act.

8. The regulations promulgated under § 242 (b) must require that decisions of deportability be based upon reasonable, substantial and probative evidence. To the same effect is § 7 (c) of the Administrative Procedure Act.

9. Finally, in addition to the requirements of § 242 (b), there is the direction of § 101 (b)(4) of the Immigration Act that the special inquiry officer shall be subject to such supervision as the Attorney General shall prescribe. This covers the same question as the portion of § 5 (c) of the Administrative Procedure Act dealing with the supervision and control of hearing officers.

From the Immigration Act's detailed coverage of the same subject matter dealt with in the hearing provisions of the Administrative Procedure Act, it is clear that Congress was setting up a specialized administrative procedure applicable to deportation hearings, drawing liberally on the analogous provisions of the Administrative Procedure Act and adapting them to the particular needs of the deportation process. The same legislators, Senator McCarran and Congressman Walter, sponsored both the

Administrative Procedure Act and the Immigration Act, and the framework of the latter indicates clearly that the Administrative Procedure Act was being used as a model. But it was intended only as a model, and when in this very particularized adaptation there was a departure from the Administrative Procedure Act—based on novel features in the deportation process—surely it was the intention of the Congress to have the deviation apply and not the general model. Were the courts to ignore these provisions and look only to the Administrative Procedure Act, the painstaking efforts detailed above would be completely meaningless. Congress could have accomplished as much simply by stating that there should be a hearing to determine the question of deportability.

Section 242 (b) expressly states: "The procedure [herein prescribed] shall be the sole and exclusive procedure for determining the deportability of an alien under this section." That this clear and categorical direction was meant to exclude the application of the Administrative Procedure Act is amply demonstrated by the legislative history of the Immigration Act. The original bills included statements to the effect that the § 242 (b) procedures were to be exclusive, "[n]otwithstanding any other law, including the [Administrative Procedure Act]." S. 3455, 81st Cong., 2d Sess.; S. 716, 82d Cong., 1st Sess.; H. R. 2379, 82d Cong., 1st Sess. The "notwithstanding" clause was dropped in later versions of the Act and did not appear in the bills reported out of committee or in the statute as finally enacted. S. 2055, 82d Cong.; H. R. 5678, 82d Cong.; S. 2550, 82d Cong. The deletion is nowhere explained, but it is possible that the phrase was considered unnecessary—and perhaps inappropriate as a description—as § 242 (b) became more detailed, encompassing in its particularization the greater part of the Administrative Procedure Act's hearing provisions. In the Senate Report accompanying the revised bill, it is

stated that § 242 (b) sets up special procedures for deportation proceedings, that these are made exclusive, and that the exemption from the Administrative Procedure Act in the Supplemental Appropriation Act of 1951 is repealed because it is "no longer necessary." S. Rep. No. 1137, 82d Cong., 2d Sess., p. 28. The House Report is to the same effect, stating that the prescribed deportation proceedings shall be the sole and exclusive procedure, "notwithstanding the provisions of any other law." H. R. Rep. No. 1365, 82d Cong., 2d Sess., p. 58. Throughout the debates it is made clear that the Administrative Procedure Act does not apply directly, but that its provisions have been specially adapted to meet the needs of the deportation process. See particularly the detailed statement of Senator McCarran, 98 Cong. Rec. 5625–5626, wherein he recognizes a departure from the "dual-examiner provisions" of the Administrative Procedure Act, the very section here in issue.

Exemptions from the terms of the Administrative Procedure Act are not lightly to be presumed in view of the statement in § 12 of the Act that modifications must be express, cf. *Shaughnessy* v. *Pedreiro,* 349 U. S. 48. But we cannot ignore the background of the 1952 immigration legislation, its laborious adaptation of the Administrative Procedure Act to the deportation process, the specific points at which deviations from the Administrative Procedure Act were made, the recognition in the legislative history of this adaptive technique and of the particular deviations, and the direction in the statute that the methods therein prescribed shall be the sole and exclusive procedure for deportation proceedings. Unless we are to require the Congress to employ magical passwords in order to effectuate an exemption from the Administrative Procedure Act, we must hold that the present statute expressly supersedes the hearing provisions of that Act.

*The Hearing Procedures and Due Process.*

As noted above, the only complaint which petitioner can urge concerning the hearing procedures in this case is the objection that the special inquiry officer was subject to the supervision and control of officials in the Immigration Service charged with investigative and prosecuting functions. Petitioner would have us hold that the presence of this relationship so strips the hearing of fairness and impartiality as to make the procedure violative of due process. The contention is without substance when considered against the long-standing practice in deportation proceedings, judicially approved in numerous decisions in the federal courts, and against the special considerations applicable to deportation which the Congress may take into account in exercising its particularly broad discretion in immigration matters.

*The Claim of Prejudgment.*

Our opinions in the *Accardi* cases stand for the proposition that the Attorney General cannot, under present regulations, dictate the actions of the Board of Immigration Appeals. *Accardi* v. *Shaughnessy,* 347 U. S. 260; *Shaughnessy* v. *Accardi,* 349 U. S. 280. Petitioner alleges that his case was prejudged within the meaning of these decisions because on the day of his arrest for deportation the Attorney General "announced in a public statement [5] both in Washington and in New Orleans that

---

[5] Petitioner introduced clippings appearing in New Orleans newspapers relating to the statement. While the press release of the Attorney General was not put in evidence, it read as follows:

. "Attorney General James P. McGranery announced today that Carlos Marcello of Miami, Florida, and Jefferson Parish, Louisiana, has been arrested on a deportation warrant by the Immigration and Naturalization Service.

"The arrest in New Orleans was the first major deportation move undertaken since the new Immigration and Nationality Act became

[petitioner] was an undesirable citizen and had been guilty of many crimes, and that the proceedings were specially designed to deport petitioner," and that "such publicity was bound to have great effect upon the special inquiry officer." He alleged, further, that "the Attorney General some time in 1952 prepared a list of 152 persons whom he desired to deport, and that [his] name was included on this list."

Considering first the alleged list, it is clear that petitioner has not made out a case of prejudgment. He did not allege that either the inquiry officer or the Board of Immigration Appeals had seen the list, had known of its existence, or had been influenced in their decisions by the inclusion of petitioner's name thereon. In argument before the Board, petitioner stated through counsel that he had "the feeling—and it's a feeling that's based upon

---

effective December 24, 1952. The action was another step in the Attorney General's program of denaturalization and/or deportation of undesirable persons of foreign birth who are engaged in racketeering or other criminal activities.

"Marcello, born February 6, 1910, in Tunis, Africa, entered the United States for permanent residence October 7, 1910, at New Orleans.

· "He allegedly is engaged in large-scale slot machine operations and other gambling activities in Louisiana.

"The deportation warrant was based on his conviction in 1938 for violation of the Marijuana Act. Such a conviction is a deportable offense under the new Immigration and Nationality Act.

"The action follows lengthy investigations by both the Federal Bureau of Investigation and the Immigration and Naturalization Service. His conviction under the Marijuana Act was one of only two in his checkered career. The other case in which he was convicted was under Louisiana State law, the conviction being for assault and robbery, and on May 13, 1930, he was sentenced to serve a term of 9 to 14 years in the Louisiana State Penitentiary. The Governor of Louisiana gave him a full pardon for this crime July 16, 1935.

"Marcello served a year and a day after his conviction under the Marijuana Act."

evidence which we will supply—that the real basis for the denial of suspension here was the fact that Marcello was one of these hundred whom the Attorney General had named . . . ." No evidence of this was forthcoming. As to petitioner's charges concerning the Attorney General's "list," the record is completely barren.

Nor does petitioner fare better in seeking to base prejudgment on the unfavorable publicity accompanying his arrest. He introduced newspaper clippings into evidence to show the adverse local publicity and alleged that this publicity must have had a "great effect" upon the special inquiry officer. But the record indicates clearly that petitioner's case could not possibly have been prejudiced in the hearing before the inquiry officer. On the question of petitioner's deportability, the sole issue decided by him, the hearing officer merely applied the statute to the undisputed facts. Petitioner admitted that he was deportable under the Immigration Act of 1952 if the Act could constitutionally base deportation on his 1938 marihuana conviction. And the hearing officer could be expected in any event to take the law as Congress enacted it. In view of this Court's decisions on the *ex post facto* objection, the only ground of attack, he could do nothing else. Petitioner waived the only issue on which prejudgment was possible when he declined to apply for discretionary relief at the proper time. See 8 CFR § 242.54 (d).

The Board of Immigration Appeals considered the availability of discretionary relief, but as to these officials there was not even an allegation by petitioner that they had known of the unfavorable publicity or had been influenced by it. Indeed, there is every indication that the Board had not prejudged the case, since it considered the question of suspending deportation on the merits although not bound to do so in view of petitioner's waiver below. The Board denied the requested relief, giving reasons. It is not for us in this proceeding to pass on the

factors relied on by the Board in reaching its conclusion. It is sufficient to observe that all had basis in the record and that none stemmed from any sort of dictation by the Attorney General.

Finally, we note that, even as to his claim relating to adverse publicity, petitioner introduced no evidence other than the newspaper clippings. Surely on this meager showing the district judge was warranted in finding—as he did—that the special inquiry officer, the only official mentioned in petitioner's pleadings, was not controlled in his decision by superiors in the Department of Justice. The decision of the district judge cannot be set aside as clearly erroneous. Accordingly, we hold that under our *Accardi* decisions petitioner has failed to make out a case for a new hearing.

## Ex Post Facto.

Petitioner's last objection stems from the fact that his conviction under the Marihuana Tax Act was not ground for deportation at the time he committed the offense, and that he was not forewarned of all the consequences of his criminal conduct. It is urged that we depart from our recent decisions holding that the prohibition of the *ex post facto* clause does not apply to deportation, and strike down as unconstitutional the retroactive application of the new grounds for deportation in § 241 (a)(11) of the Immigration and Nationality Act of 1952. We perceive no special reasons, however, for overturning our precedents on this matter, and adhere to our decisions in *Galvan* v. *Press,* 347 U. S. 522, and *Harisiades* v. *Shaughnessy,* 342 U. S. 580.

*Affirmed.*

MR. JUSTICE HARLAN took no part in the consideration or decision of this case.

MR. JUSTICE BLACK, with whom MR. JUSTICE FRANK-FURTER joins, dissenting.

Petitioner was lawfully brought to this country forty-four years ago when he was eight months old and has resided here ever since. He is married and has four children. His wife and children are American citizens. It is settled that he cannot be deported without being accorded a fair hearing in accordance with the Due Process Clause of the Fifth Amendment.[1]

A fair hearing necessarily includes an impartial tribunal. Petitioner claims that the circumstances here deprived him of that kind of tribunal. The officer who conducted the hearings, decided the case and made recommendations for deportation was connected with the Immigration and Naturalization Service. This hearing officer was subject to the supervision, direction and control of the Attorney General and his subordinate supervisory officers of the Immigration Service who perform investigative and prosecutorial functions. Thus the hearing officer adjudicated the very case against petitioner which the hearing officer's superiors initiated and prosecuted. Petitioner's argument is that requiring him to have his cause adjudicated by such a subordinate of the prosecutors deprives him of due process. This due process challenge cannot be lightly dismissed, but I find it unnecessary to rest my dissent on a determination of that question. For Congress in the Administrative Procedure Act[2] has barred hearing officers from adjudicating cases under the circumstances here, and I think that Act is applicable to this case.

Section 5 (c) of the Administrative Procedure Act forbids hearing officers covered by the Act to conduct hearings if they are "responsible to or subject to the super-

---

[1] *Japanese Immigrant Case,* 189 U. S. 86, 100–101; *Wong Yang Sung* v. *McGrath,* 339 U. S. 33, 49–51.

[2] 60 Stat. 237, 5 U. S. C. §§ 1001–1011.

vision or direction of any officer, employee or agent engaged in the performance of investigative or prosecuting functions for any agency." In 1950 we held in *Wong Yang Sung* v. *McGrath*, 339 U. S. 33, that deportation proceedings must be conducted as required by § 5. Congress, however, later in 1950, put a rider on an appropriation bill providing that "Proceedings under law relating to the exclusion or expulsion of aliens shall hereafter be without regard to the provisions of sections 5, 7, and 8 of the Administrative Procedure Act." [3] Were this express modification of the Procedure Act still in effect, we would have to reach the constitutional question raised by petitioner. But this appropriation rider was repealed in the 1952 Immigration and Nationality Act. [4] The result of this repeal was to leave § 5 (c) of the Administrative Procedure Act applicable to immigration cases unless, as the Government contends, other provisions of the 1952 Immigration Act made the Procedure Act inapplicable. I think this contention of the Government should not be sustained.

Section 12 of the Procedure Act provides that "No subsequent legislation shall be held to supersede or modify the provisions of this Act except to the extent that such legislation shall do so expressly." The 1950 appropriation rider was an express modification of the prior Procedure Act, but unlike the Court I find no such express modification in the 1952 Immigration Act. Indeed that Act's legislative sponsors disclaimed any purpose to bring about even an implied modification.

Both the Procedure Act and the 1952 Immigration Act were sponsored by Senator McCarran and Representative Walter. Their original proposals which finally evolved into the 1952 Act did expressly provide that the Procedure Act should not control proceedings under the Immigration

---

[3] 64 Stat. 1048, 8 U. S. C. (1946 ed.) § 155a.

[4] 66 Stat. 166, 8 U. S. C. § 1101 *et seq.*

Act. The provision was that *"Notwithstanding any other law, including the Act of June 11, 1946* [the Administrative Procedure Act], the proceedings so prescribed shall be the sole and exclusive procedure for determining the deportability of an alien who is in the United States." [5] Hearings on these proposals brought strong protests from some organizations, including the American Bar Association, against the provision making the Administrative Procedure Act inapplicable to deportation proceedings.[6] Afterwards the sponsors of the immigration measures introduced new bills which significantly omitted from that provision the words "Notwithstanding any other law, including the Act of June 11, 1946 [the Administrative Procedure Act]." Consequently when the bill finally passed there was no language which "expressly" superseded or modified the binding requirement of § 5 (c) of the Administrative Procedure Act.

Senators who voted for the new version which became the 1952 Immigration Act were assured by the senatorial sponsor:

> "The Administrative Procedure Act is made applicable to the bill. The Administrative Procedure Act prevails now. . . . The bill provides for administrative procedures and makes the Administrative Procedure Act applicable insofar as the administration of the bill is concerned." [7]

And House members voting for the 1952 Immigration Act were assured by its House sponsor:

> "Instead of destroying the Administrative Procedures Act, we undo what the Congress did in a deficiency

---

[5] Emphasis supplied.

[6] Joint hearings before the Subcommittees of the Committees on the Judiciary on S. 716, H. R. 2379, H. R. 2816, 82d Cong., 1st Sess. 526–537, 591, 691–692, 739.

[7] 98 Cong. Rec. 5778, 5779.

appropriation bill several years ago when it legislated to overturn a decision of the Supreme Court, which ruled that the Administrative Procedures Act is applicable in deportation proceedings. We undo that. So here, instead of our destroying the Administrative Procedures Act, we actually see that it is reinstated in every instance." [8]

Reassuring the House again the next day, Representative Walter said:

"We have been very zealous to see that the philosophy underlying that act [Administrative Procedure] is embodied in this measure. I am sure that if the gentleman will look at page 163, paragraph 46, he will find that the law as it was before the House adopted this amendment to an appropriation bill, has been reinstated and that the decision of the Supreme Court in the Sung case will be the law of the land when this code is adopted." [9]

As previously pointed out the *Sung* case held that § 5 (c) of the Administrative Procedure Act did apply to deportation cases.

Other statements in the discussions of the 1952 Act may look in a different direction from the statements just quoted. But whatever was said, no language in the 1952 Immigration Act expressly authorizes deportation cases to be heard, contrary to the Administrative Procedure Act, by hearing officers who are the dependent subordinates of the immigration agency's prosecutorial staff. The idea of letting a prosecutor judge the very case he prosecutes or supervise and control the job of the judge before whom his case is presented is wholly inconsistent with our concepts of justice. It was this principle on which Congress presumably acted in passing the Procedure Act. Only

[8] 98 Cong. Rec. 4302.
[9] 98 Cong. Rec. 4416.

the other day we had pointed out to us an instance in which the immigration authorities had relieved an immigration hearing officer from his duties because they believed that the hearing officer had failed adequately to present available derogatory information against an alien.[10]  It is hard to defend the fairness of a practice that subjects judges to the power and control of prosecutors.   Human nature has not put an impassable barrier between subjection and subserviency, particularly when job security is at stake.   That Congress was aware of this is shown by the Procedure Act, and we should not construe the Immigration Act on a contrary assumption.

I would reverse this case.

Mr. Justice Douglas, dissenting.

The Constitution places a ban on all *ex post facto* laws. There are no qualifications or exceptions.   Article I, § 9, applicable to the Federal Government, speaks in absolute terms: "No . . . ex post facto Law shall be passed." [1] The prohibition is the same whether a citizen or an alien is the victim.   So far as *ex post facto* laws are concerned, the prohibition is all-inclusive and complete.

There is a school of thought that the *Ex Post Facto* Clause includes all retroactive legislation, civil as well as criminal.   See Crosskey, Politics and the Constitution, Vol. I, c. XI; Vol. II, p. 1053.   Mr. Justice Johnson took that view, maintaining that a restriction of the Clause to criminal acts was unwarranted.   See *Ogden* v. *Saunders*, 12 Wheat. 213, 271, 286; *Satterlee* v. *Matthewson*, 2 Pet. 380, 416, 681 (Appendix).   The Court, however, has stated over and again since *Calder* v. *Bull*, 3 Dall.

---

[10] *Shaughnessy* v. *Accardi*, 349 U. S. 280, 292 (dissenting opinion).

[1] The ban against *ex post facto* state legislation is also absolute:

"No State shall . . . pass any . . . ex post facto Law . . . ." Art. I, § 10.

386, that the *Ex Post Facto* Clause applies only in criminal cases. See *Carpenter* v. *Commonwealth,* 17 How. 456, 463; *Johannessen* v. *United States,* 225 U. S. 227, 242; *Bugajewitz* v. *Adams,* 228 U. S. 585, 591; *Mahler* v. *Eby,* 264 U. S. 32, 39.

At the same time, there was a parallel development in the field of *ex post facto* legislation. Chief Justice Marshall in *Fletcher* v. *Peck,* 6 Cranch 87, 138–139, refused to construe the *Ex Post Facto* Clause narrowly and restrict it to criminal prosecutions. The *Fletcher* case held that property rights that had vested could not be displaced by legislative fiat. That liberal view persisted. It was given dramatic application in post-Civil War days. The leading cases are *Cummings* v. *Missouri,* 4 Wall. 277, and *Ex parte Garland,* 4 Wall. 333, where the right to practice a person's profession was sought to be taken away, in the first case by a State, in the second by the Federal Government, for acts which carried no such penalty when they were committed. The essence of those proceedings was the revocation of a license. Yet the Court held them to be violative of the *Ex Post Facto* Clauses because they were "punishment" for acts carrying no such sanctions when done.

Deportation may be as severe a punishment as loss of livelihood. See *Bridges* v. *Wixon,* 326 U. S. 135, 154; *Delgadillo* v. *Carmichael,* 332 U. S. 388, 391. As Mr. Justice Brandeis stated in *Ng Fung Ho* v. *White,* 259 U. S. 276, 284, deportation may result "in loss of both property and life; or of all that makes life worth living."

I find nothing in the Constitution exempting aliens from the operation of *ex post facto* laws. I would think, therefore, that, if Congress today passed a law making any alien who had ever violated any traffic law in this country deportable, the law would be *ex post facto.* Congress, of course, has broad powers over the deporta-

tion of aliens.  See *Harisiades* v. *Shaughnessy*, 342 U. S. 580.  But the bare fact of a traffic violation would not reasonably be regarded as demonstrating that such a person was presently an undesirable resident.  It would relate solely to an historic incident that carried no such punishment when committed.  The present Act has the same vice.  The alien is not deported after a hearing and on a finding by the authorities that he is undesirable for continued residence here.  It is the bare past violation of the narcotic laws that is sufficient and conclusive, however isolated or insignificant such violation may have been.  8 U. S. C. § 1251.  The case is, therefore, different from the earlier deportation cases where the past acts were mere counters in weighing present fitness.[2]

In the absence of a rational connection between the imposition of the penalty of deportation and the *present* desirability of the alien as a resident in this country, the conclusion is inescapable that the Act merely adds a new punishment for a past offense.  That is the very injustice that the *Ex Post Facto* Clause was designed to prevent.

---

[2] In *Mahler* v. *Eby*, 264 U. S. 32, the Act in question provided that aliens in certain classes (including those convicted under specified statutes) should be deported if the Secretary of Labor found those aliens to be undesirable residents of the United States.  Thus the primary basis for deportation was a finding by the appropriate administrative official that an alien was presently an undesirable resident.  In *Bugajewitz* v. *Adams*, 228 U. S. 585, the Court stated with regard to the alien to be deported, ". . . we must take it, at least, that she is a prostitute now," and concluded that, with regard to her, it was "not necessary to construe the statute as having any retrospective effect."  *Id.*, at 590, 591.

*Johannessen* v. *United States*, 225 U. S. 227, involved an attempt to cancel a certificate of citizenship on the ground it had been fraudulently and illegally procured.  The Court pointed out that the Act did not impose a new penalty on the wrongdoer but merely provided a method for depriving him of a privilege "that was never rightfully his."  *Id.*, at 242–243.