George **VLISIDIS**, Plaintiff,

v.

**J. W. HOLLAND**, District Director, Immigration and Naturalization Service, Defendant.

Nicholaos **MAVRELOS**, Plaintiff,

v.

**J. W. HOLLAND**, District Director, Immigration and Naturalization Service, Defendant.

Civ. A. Nos. 21438, 21463.

United States District Court
E. D. Pennsylvania.
April 18, 1957.

Judgment Affirmed July 3, 1957.
See 245 F.2d 812.

J. J. Kilimnik, Philadelphia, Pa., for plaintiff.

W. Wilson White, U. S. Atty., Louis C. Bechtle, Asst. U. S. Atty., Philadelphia, Pa., Gilbert Zimmerman, Regional Counsel, Southeast Region Immigration & Naturalization Service, Richmond, Va., of counsel, for defendant.

LORD, District Judge.

These are like civil actions for declaratory judgments and judicial review. The plaintiffs have been found to be aliens subject to deportation, and have been ordered deported. Those findings were the results of hearings conducted by Special Inquiry Officers of the Immigration and Naturalization Service, whose orders were affirmed by the Board of Immigration Appeals. Plaintiffs have asked this Court to find that the deportation orders are invalid, and to restrain the defendant from taking further steps toward their deportation.

Defendant has moved for a summary judgment of dismissal.

These cases again present the now somewhat familiar situation in which alleged aliens stand mute at deportation proceedings. United States ex rel. Bilokumsky v. Tod, 1923, 263 U.S. 149, 44 S.Ct. 54, 68 L.Ed. 221; United States ex rel. Vajtauer v. Commissioner of Immigration, 1927, 273 U.S. 103, 47 S.Ct. 302, 71 L.Ed. 560; United States ex rel. Zapp v. District Director of Immigration and Naturalization, 2 Cir., 1941, 120 F.2d 762; Quilodran-Brau v. Holland, 3 Cir., 1956, 232 F.2d 183; Ocon v. Guercio, 9 Cir., 1956, 237 F.2d 177; Caetano v. Shaughnessy, D.C.S.D.N.Y.1955, 133 F.Supp. 211; Williams v. Butterfield, D.C.E.D.Mich.1956, 145 F.Supp. 567; Da Costa v. Holland, D.C.E.D.Pa., 151 F.Supp. 746, opinion by Kirkpatrick, Chief Judge.

As may be expected, however, such cases present variations in the nature of the asserted grounds for deportation and in the reasons, if any, given for the silence of those appearing at the hearings on deportation.

In the present cases, the plaintiffs had been called to answer allegations that they were subject to deportation since they had entered the United States as non-immigrants and had thereafter failed to comply with the conditions of that status. In other words, the Immigration Service asserted, and determined

after hearing, both plaintiffs to be alien crewmen who had entered the United States on shore leaves and had failed to depart with their ships. On the ground that such asserted conduct could subject them to criminal liability under the statutes of the United States, the plaintiffs refused to answer the questions of the Special Inquiry Officers at their respective hearings. Over objections, the Special Inquiry Officers received in evidence a number of documentary exhibits from the departmental files. Such included material from which the Special Inquiry Officers made the findings upon which the orders of deportation were based.

Both aliens had been interviewed by Immigration Officers at Albany, New York, some time before the hearings which are here challenged. At those Albany interviews they had voluntarily executed sworn question-and-answer statements admitting alienage, the circumstances of their entrances at United States ports as seamen, and their subsequent violations of the conditions of such admissions.

The deportation proceedings here in question had been originally set for hearing at the New York Office of the Service. In response to requests by present counsel for plaintiffs, however, both cases were thereafter transferred to the Philadelphia Office of the Service, and took place in the latter city.

The chief contention of the plaintiffs is that, since the officers who originally interviewed the plaintiffs at Albany were not present at the Philadelphia hearings, there was no identification of the parties or the exhibits at the latter place. Those exhibits, which included landing permits, seamen's papers, and a passport—in addition to the sworn statements heretofore described—were relied upon by the administrative triers of fact in reaching their decisions.

Somewhat significantly, plaintiffs have never denied that they are aliens, nor have they ever asserted that they are lawfully in this country. Their positions, throughout, have simply been that the Government did not prove the cases against them before the Special Inquiry Officers, in that the documents and exhibits were not related to them. Since the officers who conducted the Albany interviews were not produced at the Philadelphia hearings, they complain, they have been denied due process of law.

The matter has long since been settled in the United States Courts to the contrary. It is true that in most of the cases heretofore cited wherein alleged deportable aliens have refused to answer, there has been no claim of Fifth Amendment privilege. In others, such claim has been without substantial basis, e. g. Caetano v. Shaughnessy, D.C.S.D. N.Y.1955, 133 F.Supp. 211, 213. An exception is United States ex rel. Zapp v. District Director of Immigration and Naturalization, 2 Cir., 1941, 120 F.2d 762. There the aliens had maintained silence in administrative deportation proceedings, invoking the Fifth Amendment. Their claim of privilege was indeed warranted, since federal criminal indictments were then pending against them for the crimes of having failed to register as foreign agents and, as to petitioner Zapp, for having filed a false registration statement. Dismissing the peition for a writ of habeas corpus, the Court of Appeals for the Second Circuit, Clark, J., held that at page 764:

"* * * the privilege against self-incrimination may be operative in [deportation] proceedings, but in that event the alien's silence may be evidence against him. Any limitation upon the right to exclude aliens because of other provisions of municipal or national law would, of course, be a serious impairment of sovereignty and might well produce dangerous results. * * *"

The passage last quoted leads to the final aspects of the present case. Much has been made by plaintiffs of the unfairness, in the face of the Fifth Amendment claims, of the Government's posi-

tion that inferences may be drawn from the silences of those who refuse to answer on those grounds at deportation proceedings.

For one answer, it is settled that the inference may be drawn generally, and no less in these cases—since it is axiomatic that a deportation proceeding is civil rather than criminal (see Appendix I, *infra*.) Furthermore, in such cases, the Fifth Amendment privilege has no connection with the basic evidential proposition, as determined in the Zapp case last cited. Elaboration of the evidential rule (as opposed to the due process rule) appears in part II of the Appendix.

In the present cases, the Special Inquiry Officers had before them departmental official records which would have been admissible even in federal judicial proceedings, see Rule 44, Federal Rules Civil Procedure, 28 U.S.C., set out in part III of the Appendix. Such documents included, in the case of plaintiff Vlisidis, even a Greek passport bearing a photograph which the Special Inquiry Officer specifically found to be a good likeness of the person then before him. Insofar as an inference, drawn from the silence of the subject in the particular case, was deemed necessary to support the identifications and findings, such inference was clearly justified. Looking at the matter less legalistically, one may say that if the particular plaintiff felt that he was being misidentified, or unjustifiably connected to the subject of the exhibits, he might well have said so—then or in the present proceedings.

To the contrary, however, the plaintiffs' positions are the essence of technicality. Despite the settled rule that deportation proceedings are not criminal in nature, those parties stand upon a ground which would be dubious, to say the least, even in a criminal prosecution, see United States ex rel. Bilokumsky v. Tod, 1923, 263 U.S. 149, 153–155, 44 S.Ct. 54, 68 L.Ed. 221. It is often held in criminal cases that when facts are peculiarly within the knowledge of the defendant, the burden is on him to present evidence of such facts, whether the proposition is an affirmative or a negative one, e. g. Wharton's Criminal Evidence § 14 (12th ed. 1955) and cases cited in Appendix IV herein, *infra*.

Plaintiffs' contentions, carried to their inevitable conclusion, would give a criminal alien a distinct advantage over one who, for instance, had innocently overstayed a visitor's leave. That is, it is settled by an unbroken line of authority —including all the cases heretofore cited —that an alien, innocent of criminality as to his presence in the United States, cannot gain an advantage by refusing to answer questions in a deportation proceeding. The petitioners here, however, claim in essence that preferment must be granted to one who, at a deportation proceeding, makes some showing that his answers would in fact incriminate him as to his presence in this country, and then stands upon the barren ground that he will not even identify himself, saying "Try to prove who I really am."

Of course, such an alien cannot be required to give answers which would incriminate him. By asserting that privilege, however, he cannot elevate himself to a status above that of other aliens whose only default, in this aspect, is that they have broken no criminal law of the United States. To the contrary, he must sooner or later show his right to stay in the country, or be required to return whence he came. In this respect he stands in a position no better, but no worse, than that of any other alien.

Much discussion in the briefs has been provoked by the decision of the United States Supreme Court in Slochower v. Board of Higher Education of New York City, 1956, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692. Suffice it to say, subject to further discussion in part V, Appendix, that the Slochower decision is deemed to be without bearing on the present cases. In the first place, the Slochower case, as the Appendix will show, turns on unrelated propositions of law and, of course, is based on a radically differ-

ent factual background. Furthermore, the case of Hyun v. Landon, 9 Cir., 1955, 219 F.2d 404, a denial of relief from an *immigration decision*, was affirmed per curiam by an equally divided court in the very volume of the Supreme Court reports in which the Slochower decision was published, i. e. Hyun v. Landon, 1956, 350 U.S. 990, 76 S.Ct. 541, 100 L.Ed. 856. In the latter, the petitioner for habeas corpus, who was subject to deportation, had been ordered deported as a result of depositions taken in Honolulu while he was in custody in San Francisco and allegedly without means to go to Honolulu or secure representation there.

From the foregoing points and authorities, it appears that plaintiffs' positions are reduced to the contention that the decision of deportability is not supported by the reasonable, substantial and probative evidence required by the Immigration Act, 8 U.S.C.A. § 1252(b)(4). By the same statute, however, such administrative decisions are stated to be subject only to final review by the Attorney General. Judicial review is at least narrow despite the fact that its boundaries are not clearly defined; see cases collected in Davis, Unreviewable Administrative Action, 15 F.R.D. 411, at pages 433–439 and cited in part VI, Appendix.

Having determined, under the authorities, that plaintiffs gained no evidential advantages by their pleas of the Fifth Amendment, and finding neither denial of due process nor arbitrary action, this Court further determines that the deportation orders were based upon evidence sufficient to warrant an administration decision. The extent to which such determinations rested upon inferences drawn from plaintiffs' refusals to produce evidence cannot be determined. Under the authorities, however, inferences would have been justified.

It must be granted, of course, that there was an initial showing that the subjects of inquiry were aliens. Otherwise, no recognition of the Fifth Amend-

ment privilege would have been warranted. Absent that predicate, the case in this respect would have been on all fours with Quilodran-Brau v. Holland, 3 Cir., 1956, 232 F.2d 183, at page 185, wherein the Court of Appeals for the Third Circuit said concerning questions pointing to alienage:

"* * * Advised by his counsel he stood mute in answer to the questions but claimed no privilege under the Fifth Amendment and, indeed, from what we see in the record, *could not have done so.* His refusal to answer supports an inference against him. And the weight to be given to his silence is for the trial tribunal. United States ex rel. Vajtauer v. Commissioner of Immigration, 1927, 273 U.S. 103, 111, 47 S.Ct. 302, 71 L.Ed. 560; Cf. United States ex rel. Bilokumsky v. Tod, 1923, 263 U.S. 149, 153, 44 S.Ct. 54, 68 L.Ed. 221; Saksagansky v. Weedin, 9 Cir., 1931, 53 F.2d 13, 16." (Emphasis supplied.)

Once the Government has established that the person sought to be deported is in fact an alien, the burden shifts to the alien to prove his right to remain in the United States, 8 U.S.C.A. § 1361; see United States ex rel. Tommaso v. Flynn, D.C.W.D.N.Y.1927, 22 F.2d 174. The plaintiffs obviously did not sustain that burden.

A history of the proceedings leading up to the administrative hearings is useful by way of introduction to evaluation of the evidence which was before the Special Inquiry Officers. Since this Court is satisfied, however, that no extended judicial examination is warranted here, the *nature of the testimonial material* and the events leading up to its presentation are simply recited below in part VII of the Appendix.

In view of the foregoing conclusions, it is hereby Ordered as follows:

Defendant's Motions for Summary Judgment are hereby Granted.

The temporary restraining order of this Court, granted October 4, 1956,

restraining defendant from deporting George Vlisidis, plaintiff in Civil Action No. 21438, is hereby Dissolved.

The temporary restraining order of this Court, granted October 9, 1956, restraining defendant herein from deporting Nicholaos Mavrelos, plaintiff in Civil Action No. 21463, is hereby Dissolved.

The petitions of plaintiffs George Vlisidis and Nicholaos Mavrelos for Declaratory Judgment, Judicial Review, and Permanent Injunctions are hereby Denied.

### Appendix

I. The Civil Nature of Deportation Proceedings.

II. Adverse Inference From Silence.

III. Proof of Official Record.

IV. Inference From Silence Permissible Even in Criminal Prosecutions.

V. Inapplicability of the Slochower case.

VI. Scope of Judicial Review in Deportation Cases.

VII. History of the Cases.

I. The Civil Nature of Deportation Proceedings.

Marcello v. Bonds, 1955, 349 U.S. 302, 75 S.Ct. 757, 99 L.Ed. 1107; Galvan v. Press, 1955, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911; Carlson v. Landon, 1952, 342 U.S. 524, 537, 72 S.Ct. 525, 96 L.Ed. 547; Harisiades v. Shaughnessy, 1952, 342 U.S. 580, 594, 72 S.Ct. 512, 96 L.Ed. 586.

II. Adverse Inference From Silence.

Cases in which the silence of the party in a civil case is explained by a supportable claim of the privilege against self-incrimination are rare. The case of United States ex rel. Zapp v. District Director of Immigration and Naturalization, 2 Cir., 1941, 120 F.2d 762, seems squarely on point, however, and dispositive of the assertion that the reason for silence dispels the usual rule.

The usual rule, of course, is that recognizing what seems almost a rule of human nature. When a party fails to produce evidence which it is peculiarly within his power to give, one (be he layman or hearing officer) is justified in inferring that the evidence would not be favorable to its withholder. United States ex rel. Bilokumsky v. Tod, 1923, 263 U.S. 149 at page 154, 44 S.Ct. 54, at page 56, recognized it squarely in frequently quoted language, the gist of which is:

"  *  *  * A person arrested on the preliminary warrant is not protected by a presumption of citizenship comparable to the presumption of innocence in a criminal case. There is no provision which forbids drawing an adverse inference from the fact of standing mute. * * * Since the proceeding was not a criminal one, Bilokumsky might have been compelled by legal process to testify whether or not he was an alien."

In United States ex rel. Vajtauer v. Commissioner of Immigration, 1927, 273 U.S. 103, 111, 47 S.Ct. 302, 306, the alien was asked whether he had written a subversive pamphlet. He stood mute, and the court said:

"  *  *  * His silence without explanation other than that he would not testify until the entire evidence was presented, was in itself evidence that he was the author. In addition, it fortified the inference drawn from the pamphlet and speech by the immigration authorities."

In Quilodran-Brau v. Holland, 3 Cir., 1956, 232 F.2d 183, the client of present counsel for the plaintiffs had been found deportable on the grounds, among others, that he had been convicted of larceny and had been previously deported. The opinion of the court, Goodrich, J., says in part at page 185:

"  *  *  * There is adequate proof of the appellant's prior deportation. He was asked about it at his hearing. Advised by his counsel he stood mute in answer to the questions but claimed no privilege under the Fifth Amendment and, indeed, from what we see in the record, could not have done so. His refusal

to answer supports an inference against him. And the weight to be given to his silence is for the trial tribunal [collecting cases] * * *."

Since a multitude of cases, and full discussion, is to be found in 2 Wigmore on Evidence (3d Ed., 1940) §§ 285, 289, no further citation seems necessary.

### III. Proof of Official Record.

Administrative hearings such as the deportation proceeding are not subject to the judicial rules of evidence, but are governed by statute (in this case 8 U.S.C.A. § 1252(b)). For a collection of 13 leading cases in the United States Courts to the effect that the judicial rules as to admissibility of evidence need not be followed in deportation hearings, see United States ex rel. Impasto v. O'Rourke, 8 Cir., 1954, 211 F.2d 609, 611. It could not conceivably be contended, therefore, that the rules as to admission of evidence are more strict in the administrative hearings, since the contrary fact is not only settled by the cases, but is of the very essence of the administrative-hearing process. Yet even in a judicial proceeding, in a Court of the United States, there is provision for introduction of records such as the exhibits here in controversy.

Rule 44 of the Federal Rules of Civil Procedure, relating to Proof of Official Record, in part is as follows:

"(a) *Authentication of Copy.* An official record or an entry therein, when admissible for any purpose, may be evidenced by * * * a copy attested by the officer having the legal custody of the record, or by his deputy, and accompanied with a certificate that such officer has the custody. * * *"

The defendant has argued that the purport of the rule is to provide that material contained in an official file may be authenticated as part of that file simply by the officer having legal custody of the record (or his deputy) attesting to the fact that it came from that source. We believe the argument has merit.

Even though the cited Rule 44 or, for that matter, the Federal Business Records Act, 28 U.S.C.A. § 1732, is not specifically applicable, *a fortiori* the use of such records would be authorized before the administrative tribunal. The Official Records exception to the hearsay rule, without the need for statute, is stated in 2 Wigmore on Evidence, § 665(1) and § 2158 (3d Ed., 1940).

Applicable here is the case of Williams v. Butterfield, D.C.E.D.Mich.1956, 145 F.Supp. 567, where the sole issue was the competency of the evidence introduced at the administrative Deportation Hearing, being seven records ranging from marriage and birth records to those showing admissions to the United States. The alien's claim that the records were improperly admitted—especially since there was (from his standpoint) no showing that they were related to the party charged with alienage—was given rather short shrift at page 569:

"The concept of due process is, of course, applicable to such a proceeding, but it does not necessarily embrace judicial rules of evidence. Plaintiff was afforded a hearing before the proper administrative agency. He was given an opportunity to testify and present evidence. He declined to exercise his right in this regard. The Government offered in evidence a number of documents on the basis of which the hearing officer concluded that the plaintiff is an alien. We are not presented with any controversy as to the authenticity of said documents, but rather with the question as to their admissibility. The question is raised by the plaintiff because of the lack of direct evidence linking plaintiff with any of the documents. That the evidence is not direct does not, however, detract from its being substantial and probative. We think it is both, as a cursory examination of the documents themselves must reveal to any person in the exercise of logical reasoning. * * *"

IV. Inference From Silence Permissible Even in Criminal Prosecutions.

Yee Hem v. United States, 1925, 268 U.S. 178, 45 S.Ct. 470, 69 L.Ed. 904; Casey v. United States, 1928, 276 U.S. 413, 418, 48 S.Ct. 373, 72 L.Ed. 632; Rossi v. United States, 1933, 289 U.S. 89, 53 S.Ct. 532, 77 L.Ed. 1051; Commonwealth v. Vallone, 1943, 347 Pa. 419, 421, 32 A.2d 889; Sparf and Hansen v. United States, 1895, 156 U.S. 51, 15 S.Ct. 273, 39 L.Ed. 343.

V. Inapplicability of the Slochower Case.

The result in Hyun v. Landon, 1956, 350 U.S. 990, 76 S.Ct. 541, 100 L.Ed. 856, suffices to show that no change in the law as to deportation is dictated by the decision in Slochower v. Board of Higher Education of New York City, 1956, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692. In the latter case, the United States Supreme Court struck down as unconstitutional a section of the New York City Charter. That section, § 903, provides (or provided) that, whenever a city employee utilizes the privilege against self-incrimination to avoid answering before a legislative committee a question relating to his official conduct, his employment shall terminate.

To make a comparison, one would have to assume or suppose that the Congress amended the Immigration and Nationality Act to provide that the status of persons in the United States would be altered with respect to the right to remain in the country by claiming the privilege against self-incrimination. A more direct comparison would be to suppose the amendment were to divest citizenship, since in the Slochower case the New York charter provision stripped Professor Slochower of his academic tenure.

VI. Scope of Judicial Review in Deportation Cases.

In terms the deportation statute provides that administrative action "shall be final," 8 U.S.C.A. § 1252(b). It has been pointed out by Professor Davis, however, that the word "final" has come to have certain special meanings with reference to the various statutes of the same tenor; see Unreviewable Administrative Action, 1954, 15 F.R.D. 411, 433. The very cases cited in the course of this opinion and appendix demonstrate that judicial review is in fact given. On the other hand, the almost complete absence of cases in which the administrative determination is disturbed indicates that the circumstances necessary to impel a court to upset the finality of the administrative result would have to be extraordinary.

It is pertinent to mention that the plaintiffs did not attempt to secure any sort of discretionary relief such as that provided by § 244 of the Immigration and Nationality Act of 1952, 8 U.S.C.A. § 1254, see Jay v. Boyd, 1956, 351 U.S. 345, 76 S.Ct. 919, 100 L.Ed. 1242. That section authorizes the Attorney General, in his discretion, to suspend deportation as to certain aliens who meet requirements as to moral character, hardship, and period of residence within the United States. Rather patently, the plaintiffs would be ineligible for such consideration—which is mentioned only on the point that the administrative remedies have been exhausted and the determinations of the Board of Immigration and Nationalization Appeals affirming the Special Inquiry Officers are "final" within the statute.

Particularly on the present issues, it is not necessary to determine with precision whether the sweep and search of the review asked by plaintiffs coincides with that of habeas corpus, or whether there is any difference in scope between the inquiry under the Declaratory Judgment Act, 28 U.S.C.A. § 2201 and review under the Administrative Procedure Act, 5 U.S. C.A. § 1001 et seq. That the differences, if any, do not affect the present case may be demonstrated by comparing the opinion of the court in Crain v. Boyd, 9 Cir., 1956, 237 F.2d 927 and the concurring opinions of Fee and Chambers, Circuit Judges, in the same case at page 933.

To the effect that the scope of review in the present proceedings is the same

as that of habeas corpus, see United States ex rel. Brzovich v. Holton, 7 Cir., 1955, 222 F.2d 840, 841 and, e. g. Rubinstein v. Brownell, 1952, 92 U.S.App. D.C. 328, 206 F.2d 449, 452, 456, affirmed per curiam sub nom. Brownell v. Rubinstein, 1954, 346 U.S. 929, 74 S.Ct. 319, 98 L.Ed. 421 by an equally divided court. Further cases are collected in the Davis article, supra, 15 F.R.D. at page 433 ff. The latest case throwing light on the matter is perhaps Brownell v. Tom We Shung, 1956, 352 U.S. 180, 77 S.Ct. 252, 1 L.Ed.2d 225.

VII. History of the Cases.

### Vlisidis

Plaintiff Vlisidis was interviewed on August 10, 1955 by an Immigration Officer at the Albany, New York Office of the Immigration and Naturalization Service. He then voluntarily executed a sworn question-and-answer statement in which he admitted that he is a native and citizen of Greece; that he last entered the United States at San Pedro, California on June 19, 1955 as a seaman aboard the SS Atlantic Wave; that he was then temporarily admitted to the United States for a period of twenty-nine days within which to reship on another vessel; and that on a prior entry, he was arrested in deportation proceedings, but was granted voluntary departure. A warrant for his arrest in deportation proceedings was thereupon issued at Albany, and served upon Vlisidis. He was then released from custody under $500 administrative bail bond, conditioned upon his appearance, when demanded, for deportation hearing and for actual deportation, if ordered.

Thereafter, a notice of a hearing, scheduled to be held in his case at the New York Office of the Service, was sent on October 5, 1955, to Vlisidis at the address furnished by him when released from Service custody. A letter dated October 6, 1955, was thereupon received from the counsel who represents Vlisidis before this Court, advising that Vlisidis was residing at an address within the jurisdiction of the Philadelphia Office of the Service, and requesting that the hearing be held at the latter Office. Pursuant to this request, a hearing was scheduled for Vlisidis at the Philadelphia Office. On request of Vlisidis' counsel, this hearing was postponed. The hearing was then rescheduled on another date, and notice thereof was furnished to Vlisidis and his counsel.

On the appointed new date set for deportation hearing, Vlisidis appeared with his counsel, and the hearing commenced. Before the Special Inquiry Officer, Vlisidis was sworn to testify, and he gave his name. He identified his counsel as representing him in the deportation proceedings. The Special Inquiry Officer then asked Vlisidis where he was born. Acting under the advice of his counsel, Vlisidis refused to answer, on the ground that his answer would tend to incriminate him. He refused on the same ground to testify to the facts of his entry. The Special Inquiry Officer asked Vlisidis whether or not he could identify the record of sworn statement voluntarily executed by (one) Vlisidis before the Immigration Officer at Albany, New York. Again, acting under the advice of his counsel, Vlisidis refused to answer that question on the ground it would tend to incriminate him. The Special Inquiry Officer thereupon entered the sworn statement in evidence. The same question as to identification was asked relative to a record of a crewman's landing permit, a passport, and a seaman's certificate, and the same refusals to answer were made on the grounds of self-incrimination. The documents were nevertheless placed in evidence by the Special Inquiry Officer, over counsel's objections that they were not properly authenticated or identified in the sense of having been related or connected-up with his client. The Special Inquiry Officer noted that the passport and the seaman's certificate bore good likenesses of the person then before him. The remainder of the hearing was composed largely of Vlisidis' refusals to answer questions—always on the ground of the privilege against self-incrimination. No

affirmative defense to the charges of alienage and deportability were offered on Vlisidis' behalf. He made no overt denials, relying solely upon his refusals to testify.

## Mavrelos

Plaintiff Mavrelos was interviewed on December 3, 1954, by an Immigration Officer at the Albany, New York Office of the Immigration and Naturalization Service. He then voluntarily executed a sworn question-and-answer statement, in which he admitted that he is a native and citizen of Greece; that he last entered the United States on October 12, 1954, as a seaman aboard the S.S. Elizabeth H.; and that he was then temporarily admitted to the United States for a period of twenty-nine days—within which to reship on another vessel. A warrant for his arrest in deportation proceedings was thereupon issued at Albany, and served upon Mavrelos. He was thereafter released from custody under $500 administrative bail bond, conditioned upon his appearance, when demanded, for deportation hearing, and for actual deportation, if ordered.

Thereafter, a letter was sent to Mavrelos on December 3, 1954, granting him permission until January 3, 1955, to depart voluntarily from the United States. A letter dated January 3, 1955, was subsequently received from the counsel who represents Mavrelos before this Court, advising that he represented Mavrelos in the administrative proceedings, and asking that the case be transferred to the Philadelphia Office of the Service, since Mavrelos was then residing within the jurisdiction of that Office. A hearing was then scheduled for Mavrelos at the Philadelphia Office of the Service. The hearing was postponed, and a new date set for hearing.

On the appointed new date set for deportation hearing, the present plaintiff Mavrelos appeared with his counsel, and the hearing commenced. Before the Special Inquiry Officer, Mavrelos was sworn to testify, and he gave his name and address. The identical pattern of questions and refusals to answer on the ground of self-incrimination then followed, as set out above in relation to Vlisidis' case. The notice of hearing; the record of sworn statement voluntarily executed by one Nicholaos Mavrelos before the Immigration Officer at Albany, New York; and the record of Mavrelos' seaman's landing permit, were entered in evidence by the Special Inquiry Officer, over counsel's objection.

There is little to be added to this recital of the facts disclosed by the record except to say that this Court has examined the transcripts of testimony taken before the Special Inquiry Officers in the two cases as well as the exhibits heretofore mentioned, and has found no basis for any inference that the plaintiffs here, as compared to the persons interviewed at Albany and placed under $500 bond, were "two other people"—so to speak.