**UNITED STATES, Appellee,**

v.

**Ingrid Josefina BODRE, Defendant, Appellant.**

**No. 91–1134.**

United States Court of Appeals, First Circuit.

Heard July 31, 1991.

Decided Oct. 28, 1991.

Rehearing and Rehearing En Banc Denied Nov. 21, 1991.

Robert D. Richman, Federal Defender Office, for defendant, appellant.

John Reinstein, Judy Rabinovitz, and Lucas Guttentag, on brief for American Civ. Liberties Union, Civ. Liberties Union of Massachusetts and Nat. Immigration Project of the Nat. Lawyers Guild, amici curiae.

Joseph M. Walker, III, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., was on brief for appellee.

Before TORRUELLA, Circuit Judge, and HILL,* and BOWNES, Senior Circuit Judges.

HILL, Senior Circuit Judge.

Appellant is a citizen of the Dominican Republic and permanent resident alien of the United States. Appellant pled guilty in the district court to charges of possession and distribution of heroin. Appellant's motion for a Judicial Recommendation Against Deportation was denied by the district court on the grounds that Congress eliminated the sentencing judge's power to make such a recommendation under Section 505 of the Immigration Act of 1990.

Appellant appeals from the district court's denial of her motion for a Judicial

* Of the Eleventh Circuit, sitting by designation.

Recommendation Against Deportation. She advances the theory that the retrospective application of Section 505 to her case violates the Constitution's prohibition against *ex post facto* laws.

We AFFIRM the district court's denial of Appellant's motion. The Judicial Recommendation Against Deportation was not an action criminal in substance and the principal effect of its repeal is upon the civil action of deportation. Accordingly, the *ex post facto* clause has no application to the Congressional repeal of the judicial power to make recommendations against deportation.

## I. BACKGROUND

Appellant, a citizen of the Dominican Republic, has been a legal permanent resident of the United States since 1985. On September 18, 1990, Appellant pled guilty in the district court to charges of conspiracy to distribute heroin and distribution of heroin in violation of 21 U.S.C. §§ 846 and 841(a)(1). Under the Immigration and Nationality Act (INA), this conviction mandated that Appellant be deported as an "aggravated felon" under 8 U.S.C. § 1251(a)(2)(A)(iii).[1]

On November 26, 1990, Appellant moved for a Judicial Recommendation Against Deportation (JRAD). Before November 29, 1990, a convicted alien could seek relief from Section 1251(a)(2)(A)(iii)'s mandatory deportation requirement by seeking a JRAD under 8 U.S.C. § 1251(b)(2), which provided:

> (b) The provision ... of this section respecting the deportation of an alien convicted of a crime or crimes shall not apply ... (2) if the court sentencing such alien for such crime shall make, at the time of first imposing judgment or passing sentence, or within thirty days thereafter, a recommendation to the Attorney General that such alien not be deported, due notice having been given prior to making such recommendation to representatives of the interested State, the Service, and prosecution authorities, who shall be granted an opportunity to make representations in the matter. The provisions of this subsection shall not apply in the case of any alien who is charged with being deportable from the United States under subsection (a)(11) of this section.[2]

While § 1251(b) referred to judicial "recommendation," a JRAD properly entered with respect to a conviction absolutely barred the Immigration & Naturalization Service (I.N.S.) from using that conviction as a basis for deportation. *See, e.g., Pacheco v. I.N.S.*, 546 F.2d 448, 452 (1st Cir.1976), *cert. denied*, 430 U.S. 985, 97 S.Ct. 1683, 52 L.Ed.2d 380 (1977); *Velez–Lozano v. I.N.S.*, 463 F.2d 1305, 1308 (D.C.Cir.1972).

However, on November 29, 1990, while Appellant's motion for a JRAD was pending, the Immigration Act of 1990 went into effect. Pub.L. No. 101–649. Section 505(a) of the 1990 Act repealed the sentencing judge's power to issue JRADs. Section 505(b) stated that the repealer took effect immediately and applied "to convictions entered *before*, on or after" November 29, 1990. Pub.L. No. 101–649, Title V, § 505(b), 104 Stat. 5050 (1990).

At the sentencing hearing on December 13, 1990, the district judge denied Appellant's motion for a JRAD. While stating that there was no doubt in his mind that he would issue the JRAD if he had the power, the district judge conceded that, under the repealer he was "powerless" to recommend

---

**1.** The Immigration Act of 1990, Pub.L. No. 101–649, Title VI, § 602(a), 104 Stat. 5077 (1990), amended the provisions of 8 U.S.C. § 1251(a)(4) and recodified them at § 1251(a)(2)(A)(iii), which provides as follows:

> (a) Any alien (including an alien crewman) in the United States shall, upon the order of the Attorney General, be deported if the alien is deportable as being within one or more of the following classes of aliens:
>
> (2)(A)(iii) Aggravated Felony

Any alien who is convicted of an aggravated felony at any time after entry is deportable. "Aggravated felony" is defined in 8 U.S.C. § 1101(a)(43) to include, by reference to 18 U.S.C. § 924(c)(2), felony narcotics offenses.

**2.** We note that Appellant is also deportable under 8 U.S.C. § 1251(a)(11) as one "convicted of a violation of, or conspiracy to violate, any law or regulation relating to the illicit possession of or traffic in narcotic drugs." *Id.*

against deportation and had "no option" whatsoever in the matter.

Appellant appeals from the ruling denying her motion, claiming that the repeal of Judicial Recommendations Against Deportation by the Immigration Act of 1990, as it applies to crimes committed before the effective date of the repealer, violates the Constitutional prohibition of *ex post facto* laws. Because the Appellant committed her crimes prior to the effective date of the Immigration Act's repeal of JRADs, the Appellant argues that application of the repealer to her would be unconstitutional.

## II. THE *EX POST FACTO* CLAUSE

### A. Limitation to Criminal Matters

■■■ The *ex post facto* clause of the United States Constitution prohibits the retrospective application of criminal laws that materially disadvantage the defendant. *See* U.S. Const., Art. I, § 9, cl. 3; Art. 1, § 10, cl. 1. Read literally, the prohibition applies to any law passed "after the fact." However, a long line of Supreme Court cases beginning with *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798), has established that the *ex post facto* clause applies only to criminal laws. *See, e.g., Collins v. Youngblood*, — U.S. —, 110 S.Ct. 2715, 2718, 111 L.Ed.2d 30 (1990) ("It has been long recognized by this Court that the Constitutional prohibition of *ex post facto* laws applies only to penal statutes which disadvantage the offender affected by them."); *Harisiades v. Shaughnessy*, 342 U.S. 580, 594, 72 S.Ct. 512, 521, 96 L.Ed. 586 (1952) ("It has always been con-

sidered that that which [the *ex post facto* clause] forbids is penal legislation which imposes or increases criminal punishment for conduct lawful prior to its enactment.")[3]

With its scope limited to criminal legislation, the *ex post facto* clause allows individuals to rely on existing law regarding criminal conduct and prevents retrospective punishment for crimes committed before any changes in the law. *E.g., Weaver v. Graham*, 450 U.S. 24, 28–29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981); *Calder*, 3 U.S. at 396 (Paterson, J.). In *Calder*, Justice Chase explained that the *ex post facto* clause was included by the Framers to assure that federal and state legislators were restrained from arbitrary or vindictive action.[4] *See Calder*, 3 U.S. at 389. From the outset, then, the Supreme Court has ruled that the *ex post facto* prohibition is a safeguard against the "lack of fair notice and governmental restraint [that exists] when the legislature increases punishment beyond what was prescribed when the crime was consummated." *Weaver*, 450 U.S. at 30, 101 S.Ct. at 965; *see Miller v. Florida*, 482 U.S. 423, 430, 107 S.Ct. 2446, 2451, 96 L.Ed.2d 351 (1987).

### B. The Clause in Deportation Proceedings

■■■ It is well established that deportation proceedings are not criminal actions. Deportation proceedings have been consistently classified as purely civil in nature. *See, e.g., I.N.S. v. Lopez–Mendoza*, 468 U.S. 1032, 1038, 104 S.Ct. 3479, 3483, 82 L.Ed.2d 778 (1984) ("A deportation proceed-

---

**3.** The Supreme Court has fashioned a three-pronged test for determining whether legislation violates the *ex post facto* clause. First, the legislation must be penal or criminal in nature. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 594–95, 72 S.Ct. 512, 521–22, 96 L.Ed. 586 (1952). Second, the legislation must be retrospective. *See Miller v. Florida*, 482 U.S. 423, 430, 107 S.Ct. 2446, 2451, 96 L.Ed.2d 351 (1987). Third, the legislation must "disadvantage the offender affected by it." *Id.* (quoting *Weaver v. Graham*, 450 U.S. 24, 30, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981)).

**4.** Justice Chase's now familiar *Calder* opinion instructs us which legislative acts in his view

implicated the primary concerns of the *ex post facto* clause:

"1st. Every law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action. 2d. Every law that *aggravates* a crime, or makes it *greater* than it was, when committed. 3d. Every law that changes the punishment, and *inflicts a greater punishment*, than the law annexed to the crime, when committed. 4th. Every law that alters the *legal* rules of *evidence*, and receives less, or different, testimony, than the law required at the commission of the offense, *in order to convict the offender*."

3 U.S. at 390 (emphasis in original).

ing is a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry, though entering or remaining in this country is itself a crime." (citation omitted)); *Harisiades v. Shaughnessy*, 342 U.S. at 594, 72 S.Ct. at 521. Consequently, the *ex post facto* clause has no application to deportation proceedings. *E.g., Galvan v. Press*, 347 U.S. 522, 531, 74 S.Ct. 737, 743, 98 L.Ed. 911 (1954) ("[T]he *ex post facto* Clause ... has no application to deportation."); *Harisiades v. Shaughnessy*, 342 U.S. at 594, 72 S.Ct. at 521 ("Deportation, however severe its consequences, has been consistently classified as a civil rather than criminal procedure ... the prohibition of *ex post facto* has no application.")

While noting the severe consequences that deportation may have on an alien, the Supreme Court has repeatedly held that deportation is not punishment for the commission of crimes. *E.g., Harisiades v. Shaughnessy*, 342 U.S. at 594–95, 72 S.Ct. at 521 ("The determination of facts that might constitute a crime under local law is not a conviction of a crime, nor is the deportation a punishment: it is simply a refusal by the government to harbor persons whom it does not want. The coincidence of the local penal law with the policy of Congress is an accident.") (quoting *Bugajewitz v. Adams*, 228 U.S. 585, 591, 33 S.Ct. 607, 608, 57 L.Ed. 978 (1913)); *Mahler v. Eby*, 264 U.S. 32, 39, 44 S.Ct. 283, 286, 68 L.Ed. 549 (1924) ("It is well settled that deportation, while it may be burdensome and severe for the alien, is not a punishment."); *Fong Yue Ting v. United States*, 149 U.S. 698, 730, 13 S.Ct. 1016, 1028, 37 L.Ed. 905 (1893).

The Supreme Court has consistently deferred to Congress in matters of deportation. *See Harisiades v. Shaughnessy*, 342 U.S. at 594, 72 S.Ct. at 521 ("It is thoroughly established that Congress has power to order the deportation of aliens whose presence in this country it deems hurtful.") (quoting *Bugajewitz v. Adams*, 228 U.S. at 591, 33 S.Ct. at 608). While there have been credible arguments brought before the Court that the *ex post facto* clause

should be applied to deportation proceedings, these arguments have never succeeded. That the *ex post facto* clause has no application to deportation proceedings is as axiomatic as any rubric in the law. In *Galvan v. Press*, 347 U.S. at 530–31, 74 S.Ct. at 742, Justice Frankfurter, writing for the Court, stated:

> [M]uch could be said for the view, were we writing on a clean slate, that ... since the intrinsic consequences of deportation are so close to punishment for crime, it might fairly be said also that the *ex post facto* Clause, even though applicable only to punitive legislation, should be applied to deportation.
>
> But the slate is not clean ... [T]here is not merely a page of history, but a whole volume. Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government ... That the formulation of these policies is entrusted exclusively to Congress has become about as firmly embedded in the legislative and judicial tissue of our body politic as any aspect of government. And whatever might have been said at an earlier date for applying the *ex post facto* Clause, it has been the unbroken rule of this Court that it has no application to deportation.

Subsequent case history has reemphasized Justice Frankfurter's words. Congressional legislation retroactively making past criminal activity a new basis for deportation has been repeatedly upheld. *See, e.g., Lehman v. U.S. ex rel. Carson*, 353 U.S. 685, 690, 77 S.Ct. 1022, 1024, 1 L.Ed.2d 1122 (1957) (alien made deportable under the Immigration and Nationality Act of 1952 for convictions of crimes involving moral turpitude in 1936); *Mulcahey v. Catalanotte*, 353 U.S. 692, 694, 77 S.Ct. 1025, 1027, 1 L.Ed.2d 1127 (1957) (alien made deportable under the 1952 Act for narcotics convictions in 1923); *Marcello v. Bonds*, 349 U.S. 302, 314, 75 S.Ct. 757, 764, 99 L.Ed. 1107 (1955) (alien made deportable under the Immigration and Nationality Act of 1952 for a marihuana conviction in 1938); and *Gardos v. I.N.S.*, 324 F.2d 179 (2d

Cir.1963) (alien made deportable by previous marihuana conviction).

To summarize, deportation has been staunchly classified as a civil rather than criminal proceeding. Deportation itself is not punishment for criminal acts but rather a governmental decision not to harbor an unwanted alien. The *ex post facto* clause has been unswervingly held as inapplicable to matters of deportation. Regarding matters of deportation, the Supreme Court has faithfully deferred to Congressional regulation.

■] In order to succeed in her appeal, Appellant must surmount these formidable judicial hurdles which are "about as firmly embedded in the judicial tissue of our body politic as any aspect of government." As we examine the arguments Appellant advances in her favor, we necessarily remain mindful that "whatever might have been said at an earlier date for applying the *ex post facto* clause, it has been the unbroken rule ... that it has no application to deportation." *Galvan,* 347 U.S. at 531, 74 S.Ct. at 743.

## III. APPELLANT'S CLAIM

■ Appellant does not question the body of law discussed above or suggest that the *ex post facto* clause applies to deportation proceedings. Rather, the Appellant claims that the Judicial Recommendation Against Deportation stood on separate footing from deportation measures. The crux of Appellant's argument is that the JRAD was criminal in nature because it was an integral part of the sentencing stage of a criminal prosecution. Appellant maintains that once Congress entrusted the sentencing judge with the exclusive power

to grant a JRAD under § 1251(b), the JRAD became a part of criminal sentencing and fell outside the civil sphere of deportation.

Appellant contends that, because the JRAD was a part of criminal sentencing, Congressional repeal of the recommendation authority, as applied to crimes committed before the effective date of the repealer, violates the Constitutional prohibition of *ex post facto* laws. Because her crimes were committed prior to the effective date of the repealer, Appellant argues that application of the repealer to her is unconstitutional.

Appellant's claim turns on whether the JRAD was criminal or civil in nature and thus whether the *ex post facto* clause applies. In supporting her argument that the JRAD was a part of criminal sentencing, Appellant relies heavily upon *Janvier v. United States,* 793 F.2d 449 (2d Cir.1986), in which the Second Circuit held that JRADs were part of the sentencing stage of a criminal prosecution and that the Sixth Amendment right to effective assistance of counsel attached. *See Janvier,* 793 F.2d at 455.

Appellant follows the reasoning of the Second Circuit in *Janvier* in asserting that the confiding of absolute discretion in the sentencing judge supports the view that the JRAD was a part of criminal sentencing. Appellant relies on the procedural framework set forth for the sentencing judge in deciding whether to issue a JRAD to bolster this position.[5]

Appellant also contends, as did *Janvier* in its exhaustive tracing, that the legislative history of 1251(b) reflects that Congress intended the JRAD to allow the sen-

---

5. Appellant argues that (1) § 1251(b) required that the decision whether to issue a JRAD be made only by the court sentencing the alien for a crime (whether that court be federal, state or local). (2) The recommendation was required to be entered at the time of passing sentence or within thirty days thereafter. Appellant argues this time restriction only makes sense if the JRAD decision is based on the seriousness of the crime, a traditional sentencing consideration, and not if the decision is based on whether deportability is appropriate; and (3) the judge's JRAD power was triggered by conviction, not

deportability. This, Appellant argues, supports the position that the JRAD decision, like the sentencing decision, was based on the judge's view of an appropriate punishment, not an alien's immigration status.

This last argument is particularly circuitous. Since deportability is triggered by conviction, it is logical that the JRAD authority would likewise be triggered by conviction. Simply because sentencing and JRAD authority are both triggered by conviction does not lead to the immediate conclusion that they are part of the same substantive law.

tencing judge to reduce criminal sentences in appropriate case. Thus, it is argued, brings the JRAD within the scope of sentencing. Finally, Appellant argues that sentencing judges applied traditional sentencing considerations to their decision whether to grant a JRAD and that this, too, removes the JRAD from the realm of civil deportation proceedings.

Appellant's argument, at its core, promotes form over substance. We disagree with Appellant's claim that JRADs were substantively part of criminal sentencing. Certainly Congress placed JRADs *procedurally* within the sentencing phase of a criminal trial. However, that procedural placement does not alter the fact that the *substantive effect* of a JRAD was on the alien's deportability status and not upon the sentence imposed. While the motion to grant a JRAD was passed on during the course of criminal sentencing (or within thirty days thereafter), the material impact of the JRAD was felt not upon the sentence but upon deportation efforts. Simply because Congress empowered an official dressed in a black robe presiding over a courtroom to make binding recommendations regarding deportation does not intrinsically render that recommendation a criminal matter. The fact that the recommendation was found in *Janvier* to be a part of the criminal sentencing phase does nothing to change this basic premise.

The substantive value of the JRAD to an alien defendant was in deportation consequences, not in criminal sentencing. This is made clear by the binding effect of a JRAD on I.N.S. deportation efforts. While a reviewing court has power to vacate a sentence imposed by a sentencing judge, that same judge's granting of a JRAD was given absolute binding effect upon deportation efforts by the I.N.S. That the sentencing judge's passing on a JRAD was given such absolute discretion upholds our opin-ion that JRADs were substantively part of deportation measures rather than criminal sentencing. Likewise, the substantive effect of the JRAD repealer is upon deportation measures, not upon criminal sentencing.

We fail to see how the punishment for Appellant's crimes has changed since their commission.[6] In the first place, regardless of what was culled from legislative history, it is axiomatic that deportation is not punishment. *E.g., I.N.S. v. Lopez–Mendoza,* 468 U.S. at 1038, 104 S.Ct. at 3483; *Harisiades v. Shaughnessy,* 342 U.S. at 594–95, 72 S.Ct. at 521. Whether a sentencing judge considered traditional sentencing factors in deciding whether to grant a JRAD does nothing to change this well established principle. Likewise, the fact that a JRAD motion and sentencing were passed on concurrently does nothing to alter the precept that deportation is not punishment.

Secondly, the fact that deportation was a mandatory consequence of Appellant's criminal conduct has not changed in any respect since the commission of her crimes. Prior to the repealer, deportation was mandatory for aliens adjudicated as aggravated felons. Deportation remains mandatory for such aliens after the repealer. While § 1251(b) was in effect, Appellant could bring a motion for a JRAD, but Appellant had no absolute right to have her motion granted as the power to grant or deny a JRAD was in the sentencing judge's discretion. Congressional repeal of discretionary power is by no means the equivalent of a change in punishment.

Both prior to and after their commission, the effect of the crimes as to Appellant's deportation *vel non* was and is a matter of immigration law. Deportation has always been a matter exclusively entrusted to Congress as "policies pertaining to the entry of aliens and their right to

---

**6.** We are mindful of the fact that, in determining whether punishment has changed for *ex post facto* purposes, the inquiry is on whether a change in the law is more onerous than preexisting law. *See Miller v. Florida,* 482 U.S. at 431, 107 S.Ct. at 2451; *Dobbert v. Florida,* 432 U.S. 282, 294, 97 S.Ct. 2290, 2299, 53 L.Ed.2d 344 (1977). In making this determination, the focus is on "the practical operation" of the change in the law rather than whether the new law is "technically an increase in the punishment annexed to the crime." *Lindsey v. Washington,* 301 U.S. 397, 399–400, 401, 57 S.Ct. 797, 798–997, 81 L.Ed. 1182 (1937).

remain here are peculiarly concerned with the political conduct of government." *Galvan v. Press*, 347 U.S. at 531, 74 S.Ct. at 743. Immigration law in general and the deportability of an alien convicted of an aggravated felony specifically are powers entrusted to the Congress. In imparting discretionary JRAD authority to sentencing judges, Congress acted peculiarly to grant the judiciary partial subject-matter jurisdiction over immigration. To the extent this jurisdiction was granted, it was but *loaned* to the judiciary by the Congress. While administering criminal law, sentencing judges were empowered to grant or deny motions for JRADs. It does not follow that JRADS were incorporated by the Congress into the larger body of criminal law. In administering discretionary JRAD authority, sentencing judges were operating under the grant of immigration law jurisdiction. The substantive character of the law administered did not change with the mere change in identity of the official acting as administrator. The JRAD was, we conclude, substantively a part of civil deportation measures.

In *Janvier v. United States*, the Second Circuit held that the JRAD decision was part of the criminal sentencing process to which Sixth Amendment safeguards were applicable. *See Janvier*, 739 F.2d at 455. The difference in our present opinion may be explained by the fact that, by emphasizing the procedural placement of the JRAD decision, the *Janvier* Court may have been striving to ensure the integrity of procedural safeguards that protect the defendant's right to effective assistance of counsel. However, to the extent the Second Circuit's opinion in *Janvier* held that the JRAD was substantively within the scope of criminal sentencing, we respectfully disagree.

To summarize, the JRAD had its substantive effect upon deportation measures, not the criminal sentence imposed. Like-

wise, the repeal of JRADs has its substantive effect upon deportation measures rather than the criminal sentences. That the sentence and JRAD were passed on concurrently during criminal administration does nothing to change these facts. Because the JRAD and its repealer were and are substantively deportation matters and within the civil realm, the *ex post facto* clause has no application to them. Accordingly, we agree with the district judge that, after November 29, 1990, he had no power to grant a JRAD and that he had "absolutely no option" other than to deny Appellant's motion for a Judicial Recommendation Against Deportation.

## IV. JUDGMENT

We AFFIRM the district court's denial of Appellant's motion for a Judicial Recommendation Against Deportation.

BOWNES, Senior Circuit Judge (dissenting).

The court's opinion is based upon the assumption that judicial recommendations against deportation ("JRAD") are not a substantive part of the criminal sentencing procedure. My statutory analysis leads me to conclude otherwise. The crux of the case turns on whether section 505 of the Immigration Act of 1990 ("1990 Act"), Pub.L. No. 101–649, Title V, section 505, 104 Stat. 4978, 5050 (1990), eliminating JRADs,[1] is penal or civil in nature. I find that the statutory purpose and legislative history of the Immigration Act of 1917 ("1917 Act"), Ch. 29, § 19, 39 Stat. 874, 889 (1917), enacting JRADs, along with the procedural mechanisms for enforcing JRADs, establish the penal nature of JRADs. It follows, therefore, that the retroactive command of section 505 of the 1990 Act, repealing JRADs, violates the *ex post facto* clause. Because Ingrid Bodre's motion for a JRAD was pending before section 505 went into effect,[2] I would find that the

---

**1.** Section 505(b) of the Act states that the repealer applies to "convictions entered *before*, on, or after" November 29, 1990. Pub.L. No. 101–649, Title V, § 505(b), 104 Stat. 5050 (1990) (emphasis added).

**2.** Bodre filed her motion for a JRAD on November 26, 1990. The repeal of JRADs took effect three days later.

district court was authorized, pursuant to 8 U.S.C. § 1251(b),[3] to issue her a JRAD as a result of her conviction of a section 1251(a)(4) crime.[4]

### Statutory Analysis

In determining whether legislation violates the *ex post facto* prohibition, we follow the three-prong test delineated by the Supreme Court. We look to see if the legislation is 1) penal in nature, *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798); 2) retrospective, *Miller v. Florida*, 482 U.S. 423, 430, 107 S.Ct. 2446, 2451, 96 L.Ed.2d 351 (1987); and 3) disadvantages the offender affected by it. *Id.* In engaging in a statutory analysis involving deportation, we construe any doubts of Congress' intent in favor of the petitioner.[5] Because we are dealing with the repeal of the *JRAD* provision, and not of the *deportation* provision, we examine the *1917* legislation that enacted JRADs to determine whether Congress intended JRADs to be penal in nature. Once we have made this inquiry, we then examine whether section 505(b) of the 1990 Act violates the *ex post facto* prohibition. This is an inquiry which the majority failed to make.

### Penal in Nature

The question of whether the law is essentially criminal or civil in nature is "one of statutory construction." *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 362, 104 S.Ct. 1099, 1105, 79 L.Ed.2d 361 (1984). The Supreme Court blazed a path for our inquiry.

> First, we have set out to determine whether Congress, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other. See *One Lot Emerald Cut Stones v. United States, supra* [409 U.S. 232], at 236–237 [93 S.Ct. 489, 492–493, 34 L.Ed.2d 438 (1972)]. Second, where Congress has indicated an intention to establish a civil penalty, we have inquired further whether the statutory scheme was so punitive either in purpose or effect as to negate that intention. See *Flemming v. Nestor*, 363 U.S. 603, 617–621 [80 S.Ct. 1367, 1376–1378, 4 L.Ed.2d 1435] (1960).

*Id.* at 362–63, 104 S.Ct. at 1105 (quoting *United States v. Ward*, 448 U.S. 242, 248, 100 S.Ct. 2636, 2641, 65 L.Ed.2d 742 (1980)). To answer this question, we must look first to the purpose of the statute, then to the legislative history, and third, to the procedural mechanisms established by Congress

---

3. Subsection 1251(b) states:

   > The provisions of subsection (a)(4) of this section respecting the deportation of an alien convicted of a crime or crimes shall not apply ... if the court sentencing such alien for such crime shall make, at the time of first imposing judgment or passing sentence, or within thirty days thereafter, a recommendation to the Attorney General that such alien not be deported.... The provisions of this subsection shall not apply in the case of any alien who is charged with being deportable from the United States under subsection (a)(11) of this section.

   The U.S. Government claims that subsection 1251(b) would not apply to convictions of aggravated felonies under subsection (a)(4)(B). This contention contravenes the straightforward reading of subsection 1251(b), which states that JRADs apply to crimes falling under subsection *(a)(4)*, under which subparagraph (a)(4)*(B)* does.

4. Bodre's conviction of conspiracy to distribute heroin and distribution of heroin, in violation of 21 U.S.C. §§ 846 and 841(a)(1), subjected her

to deportation under the "aggravated felony" provision of section 1251(a)(4), which states:

   > (a) General classes
   > Any alien in the United States ... shall, upon the order of the Attorney General, be deported, who—
   >
   > .    .    .    .    .
   >
   > (4) is convicted of a crime involving moral turpitude committed within five years after entry and either sentenced to confinement or confined therefor in a prison or corrective institution, for a year or more, or who at any time after entry is convicted of two crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct, regardless of whether confined therefor and regardless of whether the convictions were in a single trial; or (B) is convicted of an aggravated felony at any time after entry.

5. *Fong Haw Tan v. Phelan*, 333 U.S. 6, 10, 68 S.Ct. 374, 376, 92 L.Ed. 433 (1948). *See also Pacheco v. Immigration and Naturalization Service*, 546 F.2d 448, 449 (1st Cir.1976), *cert. denied*, 430 U.S. 985, 97 S.Ct. 1683, 52 L.Ed.2d 380 (1977).

to enforce the provision. *Id.* at 362–64, 104 S.Ct. at 1105.

There can be no doubt that deportation proceedings are civil in nature. *See, e.g., Immigration and Naturalization Service v. Lopez–Mendoza,* 468 U.S. 1032, 1038, 104 S.Ct. 3479, 3483, 82 L.Ed.2d 778 (1984); *Harisiades v. Shaughnessy,* 342 U.S. 580, 594, 72 S.Ct. 512, 521, 96 L.Ed. 586 (1952); *Bugajewitz v. Adams,* 228 U.S. 585, 591, 33 S.Ct. 607, 608, 57 L.Ed. 978 (1913); *Fong Yue Ting v. United States,* 149 U.S. 698, 730, 13 S.Ct. 1016, 1028, 37 L.Ed. 905 (1893). But contrary to the court's opinion, I think that the question should not focus on the nature of a *deportation* proceeding. The question, instead, should focus on the nature of a *JRAD* proceeding. In examining the nature and effects of a JRAD proceeding, I can only conclude that JRADs fall well within the ambit of criminal sentencing proceedings.

### 1. Statutory Purpose

Congress enacted JRADs in 1917 to provide judges with sole and absolute control over the deportation of defendants whom they convict of crimes of moral turpitude. This is clear from the plain meaning of the statutory language itself.

> That the provision of this section respecting the deportation of aliens convicted of a crime involving moral turpitude *shall* not apply to one ... if the court, or judge thereof, sentencing such alien for such crime shall, at the time of imposing judgment or passing sentence or within thirty days thereafter ... make a recommendation to the Secretary of Labor that such alien shall not be deported in pursuance of this Act.

Ch. 29, § 19, 39 Stat. 874, 890 (emphasis added).[6] The language granting judges the authority to issue JRADs uses the mandatory word "shall;" it gives absolute discre-

tion to the sentencing judge. As the Second Circuit, in *Janvier v. United States,* 793 F.2d 449 (1986) observed, the fact that the sentencing court has absolute authority over JRADs "indicates that the § 1251(b) process was intended to have at least a close relationship to sentencing." *Id.* at 452.

The *Janvier* court examined the role of JRADs in criminal proceedings and held that the Sixth Amendment right to effective assistance of counsel[7] applies to the request for a JRAD. In reaching its conclusion, the *Janvier* court found that "the [JRAD] is part of the sentencing process, a critical stage of the prosecution to which the Sixth Amendment safeguards are applicable." *Id.* at 455. The court pointed specifically to the binding nature of the JRAD and to the fact that the criminal sentencing judge alone was empowered to grant it.

> The confiding of such absolute discretion in the sentencing judge tends to support the view that the recommendation is part of the sentencing, for it is a normal part of the judicial function in sentencing to decide what penalty, within the statutory limits provided, shall be imposed on the convicted defendant in the circumstances of his case.

*Id.* at 452.

As the *Janvier* court explained, JRADs are distinguishable from deportation proceedings because of their nexus to the criminal sentencing process. This nexus specifically flows from the authority Congress vested in the criminal sentencing judge to issue JRADs. *Janvier,* 793 F.2d at 451–55. In contrast, the cases in which the Supreme Court has held that the *ex post facto* clause did not apply to deportation proceedings were cases involving deportation grounds, over which the sentenc-

---

**6.** This provision has been codified as 8 U.S.C. § 1251(b).

**7.** It is well-settled that the Sixth Amendment right to effective assistance of counsel applies only to critical stages of criminal prosecutions. *See Evitts v. Lucey,* 469 U.S. 387, 395–96, 105 S.Ct. 830, 835–36, 83 L.Ed.2d 821 (1985). We have also held that the right to effective assist-

ance of counsel does not apply in deportation proceedings. *Lozada v. Immigration and Naturalization Service,* 857 F.2d 10, 13 (1st Cir.1988) ("Because deportation proceedings are deemed to be civil, rather than criminal in nature, petitioners have no constitutional right to counsel under the Sixth Amendment.") *Id.*

ing judge had no authority.[8] This is different from the instant case because it involves the application of an *ex post facto* law to JRADs, which are part of the criminal sentencing process, and not grounds for deportation.

The Tenth Circuit,[9] in *Trench v. Immigration and Naturalization Service,* 783 F.2d 181 (10th Cir.), *cert. denied,* 479 U.S. 961, 107 S.Ct. 457, 93 L.Ed.2d 403 (1986), held that the appellant who challenged the lack of counsel at his deportation hearing on, *inter alia,* the ground that an attorney could have applied for a JRAD, could not collaterally attack the legitimacy of his state *criminal* convictions in the *deportation* proceedings. *Id.* at 184. The court found that the immigration court "was not authorized to evaluate the validity of petitioner's state court convictions." *Id.* This is because of the distinction in roles and authority between a criminal court, which has the authority to determine JRADs, and an immigration court, which has the authority over the deportation proceedings. Restrictions against the application of the *ex post facto* clause in deportation proceedings are therefore, inapplicable to JRADs.

It is beyond cavil that Congress has plenary authority over immigration matters.[10] Congress, in enacting the JRAD provision, delegated absolute discretion [11] to sentencing judges over the deportation of certain defendants. Judges presiding over criminal trials are not immigration judges and, for the most part, are not well-versed in immigration law. This congressional grant of absolute power over issuing JRADs to the criminal judiciary strongly suggests that Congress viewed JRADs as part of a defendant's criminal sentencing proceeding. Had Congress intended JRADs to be part of the deportation proceeding, it could have done so by keeping the sole discretionary powers over deportation matters in the hands of the immigration authorities. That Congress chose otherwise demonstrates that it intended JRADs to be part of the criminal system, and not of the immigration and deportation system. *See Janvier,* 793 F.2d at 452.

This bifurcation of roles between the criminal judiciary and immigration courts is reasonable because the Immigration and Naturalization Service ("I.N.S.") lacks criminal sanctioning powers. Congress looked to the criminal court system for such powers; thereby creating a direct nexus between JRADs and the criminal sentencing proceedings. Deportation may occur without any reference to the criminal court system. The issuance of a JRAD, however, depends upon the existence of the criminal court system, and in particular, the criminal sentencing process. The purpose of a JRAD is to permit the sentencing judge to mitigate the applicable criminal punishment.[12] Congress vested the sentencing judge with such authority because it is the judge who is most familiar with the facts of the case and therefore, best equipped to determine whether a JRAD should be issued for the particular defendant before him/her.[13]

The integral relationship between the criminal sentencing procedure and JRADs means that JRADs are part of the criminal sentencing process and not of the deportation process.

### 2. Legislative History

I agree with the *Janvier* court that the legislative history demonstrates conclusive-

---

**8.** *See, e.g., Marcello v. Bonds,* 349 U.S. 302, 75 S.Ct. 757, 99 L.Ed. 1107 (1955); *Galvan v. Press,* 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911 (1954); *Harisiades,* 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586; *Mahler v. Eby,* 264 U.S. 32, 44 S.Ct. 283, 68 L.Ed. 549 (1924); *Bugajewitz,* 228 U.S. 585, 33 S.Ct. 607.

**9.** The Ninth Circuit ruled that the 1990 Act made any issues regarding the issuing of JRADs moot. *United States v. Murphey,* 931 F.2d 606 (1991). The decision did not address any *ex post facto* concerns.

**10.** *See, e.g., Fong Yue Ting v. United States,* 149 U.S. 698, 13 S.Ct. 1016, 37 L.Ed. 905 (1893); *United States ex rel. Knauff v. Shaughnessy,* 338 U.S. 537, 70 S.Ct. 309, 94 L.Ed. 317 (1950).

**11.** Although JRADs are termed recommendations, they are absolutely binding. Thus, the grant of a JRAD absolutely bars the use of the conviction as a ground of deportation under section 1251(a)(4). *Pacheco,* 546 F.2d at 452.

**12.** *See* 53 Cong. Rec. 5169 (March 30, 1916).

**13.** *See* 53 Cong.Rec. at 5171.

ly that Congress, in drafting the 1917 Act, intended JRADs to be part of the criminal sentencing process. *Janvier*, 793 F.2d at 453–55. The House debate reveals that Congress intended to delineate separate spheres of authority between the Secretary of Labor, in his immigration powers, and the courts, in its criminal sentencing powers.

The representatives, for example, discussed who should have the authority to determine if an "alien" is advocating or teaching anarchy. The question was asked why courts should not be vested with such authority.[14] The House decided that the power to determine the advocacy or teaching of anarchy should be vested in the Secretary of Labor. 53 Cong.Rec. 5165–5172.

Congress, on the other hand, felt that the sentencing judge should have sole authority over JRAD determinations.

> Mr. Sabath. I believe that we ought not be so hard upon a man who at some time, without thinking and without really knowing it is an offense, does something which may be designated technically as a crime involving moral turpitude.... I do not think we should be too harsh on an unfortunate man of that kind. We may very likely have cases where a man has married within five years after his arrival in this country. He may have married an American woman and may have children. What will become of his wife and his children if he is deported? Mr. Mann. [Your concern] is taken care of by the provision in the bill which forbids deportation if the judge who enters the sentence does not desire to have a man deported.... Take a case such as [Mr. Sabath] has cited. Is it not almost certain that the judge would recommend that the man be not deported, and in that case he would not be deported?

53 Cong.Rec. 5169. The above discussion reveals that Congress, in enacting the JRAD provision, intended that it apply in cases similar to the instant one. Bodre has

an infant son who is an American citizen by birth, fathered by the codefendant, Beato–Rodriguez. The sentencing judge issued a JRAD for Beato–Rodriguez, who was the orchestrator of the crime. It appears from the record that Bodre had difficulties obtaining immigration counsel and did not apply for a JRAD until November 26, 1990. While her motion for a JRAD was pending, the Act went into effect, *three days after* she applied for a JRAD.

Furthermore, the thirty day framework for the issuance of a JRAD shows that Congress intended the JRAD to be part of the criminal sentencing proceedings. The House rejected an amendment to permit the recommendation to be made "at any time" after sentencing. Congress chose to have the sentencing judge make the decision. The reasons stated were that the sentencing judge is the one most familiar with the case and the facts are fresh in his/her mind during the time of sentencing. Representative Hayes, for example, stated:

> When the alien is before the judge charged with a crime and the time for sentence comes, necessarily the question of whether he shall be deported or not must be presented to the court, and when all the facts are before him, and after both sides have been heard by the court, that is the time when that important matter should be decided.

53 Cong.Rec. 5171.

The legislative history supports Bodre's contention that Congress intended JRADs to be part of the criminal sentencing process.

### 3. Procedural Mechanisms

The judge presiding over the criminal trial of a defendant subject to deportation on section 1251(a)(4) grounds, engages in the same process and considers the same factors as in regular criminal sentencing. JRADs are only available from the sentencing judge, as part of the criminal sentencing process. Immigration authorities cannot issue JRADs. It is the judge who

---

**14.** The discussion on the provision against advocacy or teaching of anarchy states: "Mr. London. Who shall determine the fact? Mr. Burnett. The immigration authorities. Mr. London. Why not say a court of competent authority." 53 Cong.Rec. at 5165.

presides over the criminal trial and sentencing of a defendant who determines whether to issue a JRAD to that same defendant.

The thirty day framework for JRAD determinations makes it highly likely that the same judge who sentenced the defendant will also be the judge who determines the issuance of a JRAD. The thirty day limit also means that the determination of a JRAD will be sufficiently close in time to the criminal trial to allow the judge to weigh the factors and facts of the criminal trial in JRAD determinations. *See Janvier,* 793 F.2d at 452–53.

The judge's power to issue a JRAD is similar to the power to impose criminal punishment in that they are both triggered by the defendant's conviction—not by the defendant's deportability. The JRAD decision, like the sentencing decision itself, is based on the judge's view of the appropriate punishment for the conviction.

### Effects of JRAD

I agree with the majority that we must examine the substantive effects of the issuance of JRADs and not be misled by mere shadows. My examination of the substantive effects of JRADs leads me to respectfully disagree with the court's holding that JRADs are civil in nature.

First, it is the *content* of the applicable provision and not the *form* that determines whether an *ex post facto* law applies. *Weaver v. Graham,* 450 U.S. 24, 31 n. 15, 101 S.Ct. 960, 965 n. 15, 67 L.Ed.2d 17 (1981). The enactment of section 505 as part of an immigration statute does not change its penal character.[15] We must examine how it operates.

The penal nature of section 505 is confirmed by its penal consequences. The majority notes that JRADs have deportation consequences and therefore, constitute part of the deportation proceedings. But as the majority also notes, the issuance of a JRAD may not necessarily bar the deportation of the defendant.[16] The defendant's deportability may serve as a consideration in the sentencing judge's JRAD determination, but it is not the only factor.

The Supreme Court has recognized that the prospect of a JRAD is "a significant factor entering into ... the defendant's decision to plea." *Weaver v. Graham,* 450 U.S. at 32, 101 S.Ct. at 966. It, therefore, is a factor in the sentence imposed. By offering protection against deportation consequences of certain convictions, JRADs had a direct impact on the criminal plea bargaining and sentencing process. With the repeal of JRADs, many alien defendants may feel compelled to reject plea offers because of the certain deportation consequences. It is not unrealistic to believe that many defendants will plead guilty to more serious crimes with *longer* sentences without deportation consequences, rather than plead guilty to lesser crimes with shorter sentences, which carry deportation consequences. Thus, the repeal of JRADs carries with it penal consequences.

The court in its opinion focuses only on the effects of JRADs and ignores the statutory analysis established by the Supreme Court to be used in examining *ex post facto* questions. In following the requisite statutory analysis, I am led to the conclusion that Congress intended JRADs to be penal in nature. This means that the 1990 Act's retrospective repeal of JRADs violates the *ex post facto* clause. For this reason, I would remand to the district court for its

---

**15.** Indeed, many sections of the INA are explicitly criminal. *See, e.g.,* 8 U.S.C. § 1324(a)(1), (2) (criminal penalties for smuggling, transporting, or harboring aliens); 8 U.S.C. § 1325 (criminal penalties for illegal entry); 8 U.S.C. § 1324a(f) (criminal penalties for employment of aliens); 8 U.S.C. § 1326 (criminal penalties for reentering after deportation).

**16.** JRADs apply only to convictions of section 1251(a)(4) crimes, but not to section 1251(a)(11)

crimes. While Bodre is also deportable on section 1251(a)(11) grounds for a narcotics conviction, the two deportation grounds carry substantially different consequences. For example, if deported for an aggravated felony conviction, Bodre would be ineligible for reentry into the United States for twenty years. On the other hand, deportation on other grounds would subject her only to a five year bar. 8 U.S.C. § 1182(a)(6)(B).

determination on the merits of issuing a JRAD to Bodre.

I respectfully dissent.