*694 KOZINSKI, Circuit Judge.
When an alien subject to removal leaves the country, the removal order is deemed to be executed. If the alien reenters the country illegally, the order may not be executed against him again unless it has been “reinstated” by an authorized official.[1] Until' 1997, removal orders could only be reinstated by immigration judges. That year, the Attorney General changed the applicable regulation to delegate this authority, in most cases, to immigration officers. We consider whether this change in regulation is valid.
I
Morales-Izquierdo, a native and citizen of Mexico, was arrested in 1994 for entering the United States without inspection. He was released and served with a mail-out order to show cause.[2] Eventually, a removal hearing was scheduled, and Morales was notified via certified mail of the time and place of the hearing. When Morales failed to attend the hearing, he was ordered removed in absentia.[3] Morales claims he never received notice of the hearing date, but the record shows that the notice was mailed to his address of record, and the Immigration and Naturalization Service (INS) received a return receipt bearing the signature “Raul Morales.”
A warrant of removal was issued, and the INS apprehended and removed Morales from the United States in 1998.[4] He attempted to reenter illegally in January 2001-this time using a false border-crossing card. He was apprehended at the port of entry, and was expeditiously removed for misrepresenting a material fact in violation of the Immigration and Nationality Act (INA) § 212(a)(6)(C)®, 8 U.S.C. *695 § 1182(a)(6)(C)(i).[5] Undaunted, Morales reentered the United States undetected the following day — a fact he disclosed to the immigration officer during the reinstatement proceeding.
Sometime between his 1998 and 2001 removals, Morales married a United States citizen. In March 2001, Morales’ wife filed an 1-130 alien relative petition based on his marriage to a United States citizen. When Morales and his wife met with the INS in January 2003, an immigration officer served them with a denial of the 1-130 petition and a notice of intent to reinstate Morales’ removal order in accordance with INA § 241(a)(5), 8 U.S.C. § 1231(a)(5) and 8 C.F.R. § 241.8. Morales petitioned here for review of the reinstatement order.
The case came before a three-judge panel, which held that the regulation authorizing immigration officers to issue reinstatement orders is invalid and Morales’ removal order could only be reinstated by an immigration judge. See Morales-Izquierdo v. Ashcroft, 388 F.3d 1299, 1305 (9th Cir.2004). We took the case en banc. See Morales-Izquierdo v. Gonzales, 423 F.3d 1118 (9th Cir.2005).
II
As noted, Morales cannot be removed again under the 1994 removal order unless and until it was reinstated. The order was reinstated by an immigration officer, who acted pursuant to 8 C.F.R. § 241.8, which authorizes immigration officers — rather than immigration judges[6]— to reinstate prior removal orders of aliens who illegally reenter the United States.[7] Morales argues that the Attorney General exceeded his authority in promulgating the regulation. The three-judge panel so held. However, the First, Sixth, Eighth and Eleventh Circuits have upheld the regulation against similar challenges. See De Sandoval v. U.S. Att’y Gen., 440 F.3d 1276, 1283 (11th Cir.2006); Ochoa-Carrillo v. Gonzales, 437 F.3d 842, 846 (8th Cir.2006); Lattab v. Ashcroft, 384 F.3d 8, 20 (1st Cir.2004). The Sixth Circuit saw the matter as so clear-cut that it did not deem it necessary to publish its disposition upholding the regulation. Tilley v. Chertoff, 144 Fed.Appx. 536, 539-40 (6th Cir.2005) (mem.), cert. denied, — U.S. -, 127 S.Ct. 62, 166 L.Ed.2d 56 (2006). No other court has reached a contrary conclusion.
A. In determining whether 8 C.F.R. § 241.8 is valid, we apply the familiar Chevron two-step approach. Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under Chevron step one, we ask “whether Congress has directly spoken to the precise question at issue,” id. at 842, 104 S.Ct. 2778 — i.e., whether *696 DHS can reinstate a prior removal order without a full-blown hearing before an immigration judge.
Here, two sections of the INA are potentially implicated. The first, INA § 240, titled “Removal proceedings,” requires that “[a]n immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien.” INA § 240(a)(1), 8 U.S.C. § 1229a(a)(l).[8] The second relevant section, INA § 241, titled “Reinstatement of removal orders against aliens illegally reentering,” provides:
If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this chapter, and the alien shall be removed under the prior order at any time after the reentry.
INA § 241(a)(5), 8 U.S.C. § 1231(a)(5). Section 241 makes no mention of a hearing before an immigration judge, or any other procedure. Most of the section is devoted to limiting the alien’s rights and ensuring that the removal is carried out expeditiously-
Morales argues that Congress spoke clearly as to whether a hearing before an immigration judge is required for reinstating a prior removal order, and did so in INA § 240. While recognizing that reinstatement is mentioned nowhere in this section, Morales claims a reinstatement order is functionally a removal order because it has the effect of authorizing an alien’s removal. In other words, reinstatement is simply a species of removal, and is thus governed by INA § 240, which calls for a hearing before an immigration judge. In support of his argument, Morales points out that when Congress has intended to exempt certain removal proceedings from the INA § 240 hearing requirement, it has done so explicitly.[9] Reinstatement is not among those proceedings explicitly exempted.
Morales’ argument that the failure to exempt reinstatement from the requirement that a hearing be held before an immigration judge, particularly when similar provisions of the same statute contain explicit exemptions, carries some force. But such failure hardly amounts to the kind of unambiguous expression of congressional intent that would remove the agency’s discretion at Chevron step one. Far more telling is the fact that reinstatement and removal are placed in different sections, which “logically can be understood as indicating a congressional intention to treat reinstatement determinations differently from first-instance determinations of removability.” Lattab, 384 F.3d at 18 (citing Alexander v. Sandoval, 532 U.S. 275, 288-91, 121 S.Ct. 1511, 149 L.Ed.2d *697 517 (2001)); see also De Sandoval, 440 F.3d at 1281. After all, “the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.” FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (quoting Davis v. Mich. Dep’t of Treasury, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989) (internal quotation marks omitted)). Here, the fact that Congress placed reinstatement in a separate section from removal suggests that reinstatement is a separate procedure, not a species of removal.
A closer look at the texts of the two sections confirms that Congress intended reinstatement to be a different and far more summary procedure than removal. Under INA § 240, first-instance removal proceedings involve a broad inquiry. To order an individual removed, the immigration judge must make two determinations: (1) whether the individual is removable from the United States; and, if so, (2) whether the individual is otherwise eligible for relief from removal. See INA § 240, 8 U.S.C. § 1229a. While the first determination can be relatively straightforward, the second is often complex and fact-intensive. The types of relief from removal include cancellation of removal for extreme hardship on U.S. citizen family members, adjustment of status for spouses of U.S. citizens and asylum. See id.; see also INA § 208, 8 U.S.C. § 1158 (asylum); INA § 240A, 8 U.S.C. § 1229b (cancellation of removal; adjustment of status). Determining what relief is warranted under any of these provisions requires a formal hearing before a trier of fact, such as an immigration judge.
The scope of a reinstatement inquiry under INA § 241 is much narrower, and can be performed like any other ministerial enforcement action. The only question .is whether the alien has illegally reentered after having left the country while subject to a removal order. As the Eleventh Circuit pointed out, INA § 241 reinstatement — -unlike INA § 240 first-instance removal — “deprives aliens of any relief, reopening, or review at the reinstatement stage.” De Sandoval, 440 F.3d at 1281. By barring all relief, Congress eliminated the second and much more difficult removal inquiry. The First and Eighth Circuits similarly found that “the elimination of any exogenous defense to reinstatement significantly narrows the range of issues to be adjudicated, thereby limiting the value of additional procedures.” Lattab, 384 F.3d at 20; see also Alvarez-Portillo v. Ashcroft, 280 F.3d 858, 867 (8th Cir.2002) (same).
Moreover, the texts of the two sections differ in their delegation of discretion: INA § 240 expressly requires that an immigration judge conduct removal proceedings, whereas INA § 241 authorizes the Attorney General to reinstate removal orders. “This distinction suggests Congress knew how to mandate a hearing before an immigration judge, but chose not to do so in the context of reinstatement orders.” De Sandoval, 440 F.3d at 1281.
Given the different layout of the two sections and their very different scope, we conclude that Congress did not consider removal and reinstatement to be equivalent. Certainly, nothing in the text of the INA, or the statutory scheme, supports Morales’ argument that reinstatement is merely a species of removal. Nor does anything in the INA express an unequivocal congressional intent that reinstatement proceedings be conducted before an immigration judge. If anything, the statutory scheme supports the opposite conclusion. See Tilley, 144 Fed.Appx. at 540 (“[T]he regulations promulgated in 8 C.F.R. § 241.8(a) meet all of the requirements of *698 [INA] § 241(a)(5). Therefore, we do not see an ambiguity that requires us to review the agency’s implementation of its governing statute.”). Indeed, it’s hard to imagine why Congress would have bothered with the detailed provisions of INA § 241 if it intended to give an alien subject to reinstatement exactly the same rights and procedural protections as an alien facing removal for the first time.[10]
B. While this case could probably be decided under the first Chevron inquiry, all other circuits that have published opinions on this matter decided the issue at Chevron step two. In an abundance of caution, we therefore proceed to the second step, which requires us to ask “whether the agency’s answer is based on a permissible construction of the statute.” Chevron, 467 U.S. at 843, 104 S.Ct. 2778. In making this determination, we “need not conclude that the agency construction was the only one it permissibly could have adopted ..., or even the reading the court would have reached if the question initially had arisen in a judicial proceeding.” Id. at 843 n. 11, 104 S.Ct. 2778. Rather, “Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows.” Nat’l Cable & Telecomms. Ass’n v. Brand X Internet Servs., 545 U.S. 967, 125 S.Ct. 2688, 2700, 162 L.Ed.2d 820 (2005) (quoting Smiley v. Citibank (S.D.), N.A., 517 U.S. 735, 740-41, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996) (internal quotation marks omitted)).
Deference to an agency’s interpretation “is especially appropriate in the immigration context where officials ‘exercise especially sensitive political functions that implicate questions of foreign relations.’ ” INS v. Aguirre-Aguirre, 526 U.S. 415, 425, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999) (quoting INS v. Abudu, 485 U.S. 94, 110, 108 S.Ct. 904, 99 L.Ed.2d 90 (1988)). For these reasons, the First, Eighth and Eleventh Circuits had “little difficulty in concluding that the government’s interpretation satisfies” the second step of Chevron. Lattab, 384 F.3d at 19-20; see also De Sandoval, 440 F.3d at 1283; Ochoa-Carrillo, 437 F.3d at 846. We find no fault with this conclusion.
Morales raises two issues, however, that our sister circuits did not consider. First, he invokes the doctrine of constitutional avoidance, asking us to construe the statute so as to avoid serious constitutional issues. Morales relies on Clark v. Martinez, 543 U.S. 371, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005):
[W]hen deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice. If one of them would raise a multitude of constitutional problems, the other should prevail— whether or not those constitutional problems pertain to the particular litigant before the Court.
Id. at 380-81, 125 S.Ct. 716; see also INS v. St. Cyr, 533 U.S. 289, 299-300, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (same). According to Morales, construing the statute so as to require that reinstatement hearings be held before an immigration judge would avoid constitutional problems that *699 arise by assigning the reinstatement function to an immigration officer. See Part III infra (discussing various constitutional challenges Morales raises to the reinstatement process).
The problem with Morales’ argument is that we are not deciding between two plausible statutory constructions; we are evaluating an agency’s interpretation of a statute under Chevron. At step two of this inquiry, our function is “not simply [to] impose [our] own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, ... the question for the court is whether the agency’s answer is based on a permissible construction of the statute.” Chevron, 467 U.S. at 843, 104 S.Ct. 2778 (internal footnote omitted). When Congress has explicitly or implicitly left a gap for an agency to fill, and the agency has filled it, we have no authority to re-construe the statute, even to avoid potential constitutional problems; we can only decide whether the agency’s interpretation reflects a plausible reading of the statutory text. Clark v. Martinez, and the constitutional avoidance doctrine it embodies, plays no role in the second Chevron inquiry.
Second, Morales argues that the Attorney General impermissibly eliminated the hearing requirement in 1997, when it had been a mainstay of the reinstatement process during the previous four decades. Compare 8 C.F.R. § 242.23(b) (repealed 1997) (requiring a hearing before an immigration judge for reinstatement), with 8 C.F.R. § 241.8(a) (“The alien has no right to a hearing before an immigration judge in [reinstatement proceedings].”). Morales labels this argument “[e]ongressional acquiescence in the prior administrative practice.” The Supreme Court, however, has drawn a sharp distinction between “ ‘Congress’ deliberate acquiescence’ ” and its “failure to express any opinion.” Rapa-nos v. United States, — U.S. -, 126 S.Ct. 2208, 2231, 165 L.Ed.2d 159 (2006) (plurality opinion). Congressional acquiescence can only be inferred when there is “overwhelming evidence” that Congress explicitly considered the “precise issue” presented to the court. . Id. (quoting Solid Waste Agency of N. Cook County v. U.S. Army Corps of Eng’rs, 531 U.S. 159, 169 n. 5, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) (“overwhelming evidence”); Bob Jones Univ. v. United States, 461 U.S. 574, 600, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983) (“precise issue”)).
Here, we concluded at Chevron step one that Congress has not expressed a clear preference that reinstatement hearings be held before immigration judges; if anything, the INA’s statutory scheme supports the opposite conclusion. Nor has Morales pointed to anything in the legislative history that discloses congressional acquiescence in the agency’s past practice— and certainly not the requisite “overwhelming evidence.” A finding of congressional acquiescence must be reserved for those rare instances where it is very clear that Congress has considered and approved of an agency’s practice, lest the agency be improperly deprived of the very flexibility Congress intended to delegate. Such is not the case here.
 We also understand Morales to be arguing that the agency’s change in policy was impermissibly inconsistent with its past practice. An “[ujnexplained inconsistency is ... a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the Administrative Procedure Act.” Brand X, 125 S.Ct. at 2699 (emphasis added). This rule, too, is reserved for rare instances, such as when an agency provides no explanation at all for a change in policy, or when its explanation is so unclear or con *700 tradictory that we are left in doubt as to the reason for the change in direction. A broader rule would deny agencies the necessary flexibility to change policies in light of “changed factual circumstances, or a change in administrations.” Id. at 2700. Indeed, Chevron itself involved a 180-de-gree reversal in an agency’s position that survived judicial scrutiny. Chevron, 467 U.S. at 857-58, 104 S.Ct. 2778; see also id. at 863, 104 S.Ct. 2778 (“An initial agency interpretation is not instantly carved in stone.”).
The regulatory change here was adequately explained. The change in the reinstatement regulation was part of a major overhaul of the INA’s implementing regulations, designed “to implement the provisions of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) and the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).” Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 444, 444 (proposed Jan. 3, 1997) (codified in scattered parts of 8 C.F.R.). The notice accompanying the proposed regulations explains that the cumbersome procedure embodied in the existing reinstatement rule “resulted in limited use of the provision.” Id. at 451. Such limited use was consistent with pre-IIRIRA law, which applied reinstatement to a narrow class of previously-deported aliens.[11] But IIRIRA dramatically expanded the class of aliens subject to reinstatement, while narrowing the defenses available in such proceedings. As the Supreme Court noted last Term, “In IIRIRA, Congress replaced [the existing] reinstatement provision with one that toed a harder line.... Unlike its predecessor, § 241(a)(5) applies to all illegal reentrants, explicitly insulates the removal orders from review, and generally forecloses discretionary relief from the terms of the reinstated order.” Fernandez-Vargas v. Gonzales, — U.S. -, 126 S.Ct. 2422, 2426, 165 L.Ed.2d 323 (2006). Congress’ ambitious purpose behind IIRIRA was to “enable the prompt admission of those who are entitled to be admitted, the prompt exclusion or removal of those who are not so entitled, and the clear distinction between these categories.” H.R.Rep. No. 104-469(1), at 111 (1996); see also id. at 107 (“Existing procedures to deny entry to and to remove illegal aliens from the United States are cumbersome and duplicative.”); U.S. Representative Zoe Lofgren, A Decade of Radical Change in Immigration Law: An Inside Perspective, 16 Stan. L. & Pol’y Rev. 349, 354-70 (2005) (asserting, albeit in disagreeing with its purpose, that IIRI-RA aimed at streamlining the removal process).
The net effect of these statutory changes is two-fold. First, IIRIRA brings vastly more aliens within the sweep of the reinstatement provision, essentially making every removed alien subject to reinstatement if he returns to the United States without the Attorney General’s permission. Second, the decision to reinstate is now far more mechanical: There need be no determination whether the alien falls *701 into one of the narrow categories specified in the earlier statute as eligible for reinstatement, see n. 11 supra, and aliens can no longer seek certain kinds of relief, such as adjustment of status. These major legislative changes provide an adequate justification for the Attorney General’s decision to make parallel changes to the implementing regulations. “Providing a mechanical procedure for the reinstatement of prior orders is entirely consistent with [IIRIRA’s] purpose” — “to make the removal of illegal reentrants more expeditious.” Lattab, 384 F.3d at 20.
We thus conclude that the regulation is a valid interpretation of the INA.
Ill
We now turn to Morales’ argument that the regulation, if authorized under Chevron, is nevertheless invalid because it violates various constitutional guarantees.
A. Morales first argues that the regulation violates due process because it assigns the reinstatement determination to an immigration officer — an official not qualified to resolve disputed questions as to the factual predicates for reinstatement. But reinstatement only requires proof that (1) petitioner is an alien, (2) who was subject to a prior removal order, and (3) who illegally reentered the United States. INA § 241(a)(5), 8 U.S.C. § 1231(a)(5); 8 C.F.R. § 241.8. And “[a]s a predicate to obtaining relief for a violation of procedural due process rights in immigration proceedings, an alien must show that the violation prejudiced him.” Padilla v. Ashcroft, 334 F.3d 921, 924-25 (9th Cir.2003) (quoting Ramirez-Alejandre v. Ashcroft, 320 F.3d 858, 875 (9th Cir.2003) (en banc)). To show prejudice, Morales must present “plausible scenarios in which the outcome of the proceedings would have been different” if a more elaborate process were provided. Walters v. Reno, 145 F.3d 1032, 1044 (9th Cir.1998).
We note at the outset that the regulation provides significant procedural safeguards against erroneous reinstatements. First, the immigration officer must verify the identity of the alien. “In disputed cases, verification of identity shall be accomplished by a comparison of fingerprints.” 8 C.F.R. § 241.8(a)(2). If no fingerprints are available, the removal order cannot be reinstated under 8 C.F.R. § 241.8. Id.; see also Ochoa-Carrillo, 437 F.3d at 847 (discussing the finger-print requirement). Second, the immigration officer “must obtain the prior order of exclusion, deportation, or removal relating to the alien.” 8 C.F.R. § 241.8(a)(1). Without this documentation, 8 C.F.R. § 214.8 cannot be used and the matter is referred to an immigration judge.[12] And, third, the officer must determine whether the alien reentered the United States illegally. “In making this determination, the officer shall *702 consider all relevant evidence, including statements made by the alien and any evidence in the alien’s possession. The immigration officer shall attempt to verify an alien’s claim, if any, that he or she was lawfully admitted, which shall include a check of Service data systems available to the officer.” 8 C.F.R. § 241.8(a)(3).
We need not determine whether these procedures are adequate as to all aliens in all cases because Morales does not dispute that he satisfies the statutory predicates for reinstatement. Rather, he argues that his 1994 in absentia removal order is defective because he never got notice of the removal hearing, his 1998 removal was actually a voluntary departure and his marriage to a U.S. citizen entitled him to adjustment of status. But the reinstatement statute specifically precludes Morales from seeking to reopen the previous removal order based on defective service or any other grounds. INA § 241(a)(5), 8 U.S.C. § 1231(a)(5).[13] And, that Morales may have departed voluntarily rather than been deported is of no consequence.[14] Finally, Morales was not entitled to adjustment of status.[15] Because none of the grounds Morales raises would have been a proper basis for relief during the reinstatement process, he suffered no prejudice by being denied access to an official who could adjudicate facts that might support these claims. Morales has thus failed to establish the requisite prejudice. See Padilla, 334 F.3d at 925 (“A hearing before an immigration judge, therefore, could not help [petitioner] because ... [sjection 1231(a)(5) provides that an alien who meets those criteria flatly ‘is not eligible’ for other relief.”).
We are satisfied, moreover, that the regulation provides sufficient procedural safeguards to withstand a facial challenge for patent procedural insufficiency. Given the narrow and mechanical determinations immigration officers must make and the procedural safeguards provided by 8 C.F.R. § 241.8, see pp. 712-13 infra, the risk of erroneous deprivation is extremely low. DHS estimates that immigration officers have issued approximately 211,000 reinstatement orders nationwide since 1999, and the amici identify only three such cases that have been reversed on grounds *703 other than retroactivity.[16] Because the risk of error is so low, any additional or substitute procedural safeguards — including those Morales seeks — would produce marginal protections, if any, against erroneous determinations, while the cost in terms of resources and delay would be substantial. Due process does not require such a poor bargain. See Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).
While the regulation does not offend due process, we leave open the possibility that individual petitioners may raise procedural defects in their particular cases. Morales himself raises several such challenges, and to these we now turn.
B. Morales first claims he had no meaningful opportunity to review his file and respond to adverse evidence. But Morales points to no material errors in his file; nor does he explain what evidence he would have presented, had he been given an opportunity to do so. 8 C.F.R. § 241.8(b) requires immigration officers to provide notice, and permits the alien to make a written or oral statement to be considered by the officer under 8 C.F.R. § 241.8(a)(3). Morales was given the benefit of these procedures, and he has failed to show how a more elaborate process would have helped him.
Second, he argues he should have had an opportunity to obtain assistance of counsel, but there is no Sixth Amendment right to counsel in any civil removal proceeding. Lara-Torres v. Ashcroft, 383 F.3d 968, 974 (9th Cir.2004). Any such right is statutory, and the INA extends the right to representation by counsel only to aliens in proceedings before an immigration judge. Similarly, the Administrative Procedure Act provides a right to counsel “in every ease of adjudication required by statute to be determined on the record after opportunity for an agency hearing.” 5 U.S.C. § 554(a). The INA does not require a hearing here. In any event, Morales cannot show prejudice: He does not contest the predicates for reinstatement, and was not eligible for any type of relief. Having a lawyer would not have changed the outcome.
Morales’ third argument, that the immigration officer who reinstated his removal order suffered from institutional bias, is foreclosed by Marcello v. Bonds, 349 U.S. 302, 75 S.Ct. 757, 99 L.Ed. 1107 (1955): “Th[is] contention [of bias] is without substance when considered against the longstanding practice in deportation proceedings, judicially approved in numerous decisions in the federal courts, and against the special considerations applicable to deportation which the Congress may take into account in exercising its particularly broad discretion in immigration matters.” Id. at 311, 75 S.Ct. 757; see also United States v. Garcia-Martinez, 228 F.3d 956, 960-63 (9th Cir.2000).
Finally, Morales argues that he was denied due process because he was not notified of the availability of judicial review. We have never required such notice in the civil immigration context, and we find no reason to require it in the reinstatement context — where an alien’s rights and remedies are severely limited. See Part III.C infra. In any event, petitioner obviously got notice because he “filed a timely petition for judicial review to this court. Again, no prejudice has been shown.” Ochoa-Carrillo, 437 F.3d at 848.
*704 C. Morales also claims that a removal order may not constitutionally be reinstated if the underlying removal proceeding itself violated due process. We have, on several occasions, expressed “serious[] doubt that the government’s new ' reinstatement procedure comports with the Due Process Clause.” Castro-Cortez v. INS, 239 F.3d 1037, 1040 (9th Cir.2001), abrogated by Fernandez-Vargas, 126 S.Ct. at 2427 & n. 5.[17] And, one of our cases lends direct support to Morales’ contention: “[T]he INS cannot reinstate a prior order of removal that did not comport with due process.” Arreola-Arreola v. Ashcroft, 383 F.3d 956, 963 (9th Cir.2004).
To the extent we so held in Arreo-la-Arreola, we revisit that decision here and reverse field: Reinstatement of a pri- or removal order — regardless of the process afforded in the underlying order— does not offend due process because reinstatement of a prior order does not change the alien’s rights or remedies. The only effect of the reinstatement order is to cause Morales’ removal, thus denying him any benefits from his latest violation of U.S. law, committed when he reentered the United States without the Attorney General’s permission in contravention of INA § 212(a)(9), 8 U.S.C. § 1182(a)(9). The reinstatement order imposes no civil or criminal penalties, creates no new obstacles to attacking the validity of the removal order, see, e.g., INA § 240(b)(5)(C)(ii), 8 U.S.C. § 1229a(b)(5)(C)(ii) (allowing reopening of a removal order based on lack of notice), and does not diminish petitioner’s access to whatever path for lawful entry into the United States might otherwise be available to him under the immigration laws.
In short, reinstatement of the removal order leaves Morales in the same position as on the date of the original removal. The Supreme Court noted this very point in Fernandez-Vargas:
While the [reinstatement] law looks back to a past act in its application to “an alien [who] has reentered ... illegally,” 8 U.S.C. § 1231(a)(5), the provision does not penalize an alien for reentry (criminal and civil penalties do that); it establishes a process to remove him “under the prior order at any time after the reentry.” Ibid. ... [T]he statute applies to stop an indefinitely continuing violation that the alien himself could end at any time by voluntarily leaving the country.
126 S.Ct. at 2432 (second alteration in original). While aliens have a right to fair procedures, they have no constitutional right to force the government to re-adjudicate a final removal order by unlawfully reentering the country. Nor is the government required to expend vast resources on extraneous procedures before reinstating a removal order that has already been finalized and executed.
Or, to put it differently, an alien who respects our laws and remains abroad after he has been removed should have no fewer opportunities to challenge his removal order than one who unlawfully reenters the country despite our government’s *705 concerted efforts to keep him out. If Morales has a legitimate basis for challenging his prior removal order, he will be able to pursue it after he leaves the country, just like every other alien in his position. If he has no such basis, nothing in the Due Process Clause gives him the right to manufacture for himself a new opportunity to raise such a challenge. The contrary conclusion would create a new and wholly unwarranted incentive for aliens who have previously been removed to reenter the country illegally in order to take advantage of this self-help remedy. It would also make a mockery of aliens who do respect our laws and wait patiently outside our borders seeking lawful admission. Nothing in the Constitution requires such a perverse result.
IV
We conclude that a previously removed alien who reenters the country illegally is not entitled to a hearing before an immigration judge to determine whether to reinstate a prior removal order. The reinstatement statute and its implementing regulation comport with due process, and 8 C.F.R. § 241.8 is a valid interpretation of the INA.
Morales has shown no violation of due process in the conduct of his reinstatement proceeding. To the extent genuine issues of material fact exist with respect to his underlying removal order, this “prior order ... is not subject to being reopened or reviewed” during the course of the reinstatement process. INA § 241(a)(5), 8 U.S.C. § 1281(a)(5).
PETITION DENIED.

. Why this is so is not clear, and neither party explains it. It’s certainly possible to conceive of a system where a removal order remains in force permanently and may be re-executed whenever the alien is found to have reentered the country illegally. As Judge Fernandez has noted, "there is nothing unusual about allowing multiple executions on a judgment until the full relief under it has been obtained.” Castro-Cortez v. INS, 239 F.3d 1037, 1055 (9th Cir.2001) (Fernandez, J., dissenting), abrogated by Fernandez-Vargas v. Gonzales, — U.S. -, 126 S.Ct. 2422, 2427 & n. 5, 165 L.Ed.2d 323 (2006). That, however, does not appear to be the way our immigration law has developed.

. When an alien is apprehended for an immigration violation, the immigration officer typically serves the alien with what is known as a mail-out order to show cause. What this means is that the alien is handed the order upon submitting an address of record. This order explains why the alien is in proceedings and under what legal authority, and it provides the address of the Immigration Court. 8 C.F.R. § 1003.15. The order also states that an alien must advise that court of any change in address, and that failure to provide such information may result in an in absentia hearing. Id. It’s called a "mail-out” order because notice of the hearing date is subsequently mailed out to the alien’s address of record.

. Morales’ 1994 removal order was actually a "deportation” order, though the difference is of no legal consequence. The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub.L. No. 104-208, div. C, 110 Stat. 3009-546, replaced all references to "deportation” with "removal.” See Gerald L. Neuman, Habeas Corpus, Executive Detention, and the Removal of Aliens, 98 Colum. L.Rev. 961, 966 (1998) ("IIRIRA realigned the vocabulary of immigration law, creating a new category of 'removal' proceedings that largely replaces what were formerly exclusion proceedings and deportation proceedings....”). To avoid more confusion than necessary, we -use the term "removal,” even when referring to a pre-1996 "deportation.”

. Contrary to the administrative record, Morales claims he was not removed at all, but that he voluntarily departed. The difference is immaterial for reinstatement purposes. See n.14 infra.

. Pre-IIRIRA, this expedited removal at the border would have been called an “exclusion.” However, “removal” now encompasses both "exclusion” and "deportation." See n.3 supra. Again, Morales denies that he was forcibly removed, claiming that he departed voluntarily.

. A prior regulation required a hearing before an immigration judge. 8 C.F.R. § 242.23 (repealed 1997).

. This regulation was originally adopted by the INS, which was part of the Department of Justice. See Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed.Reg. 10,312, 10,-379 (Mar. 6, 1997) (codified in scattered parts of 8 C.F.R.). The INS ceased to exist in 2003, and most of its functions were transferred to the Department of Homeland Security (DHS). See Homeland Security Act of 2002, Pub.L. No. 107-296, §§ 441, 471, 116 Stat. 2135, 2192, 2205 (codified at 6 U.S.C. §§ 251, 291). To minimize confusion, we use the term "INS,” even when referring to DHS' successor to the INS-U.S. Immigration and Customs Enforcement.

. Section 240 also provides certain procedural protections: the right to representation, “a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien’s own behalf, and to cross-examine witnesses,” and a complete record of the proceedings. INA § 240(b)(4), 8 U.S.C. § 1229a(b)(4).

. See INA § 235(b)(1), 8 U.S.C. § 1225(b)(1) (directing immigration officers to "order the alien removed ... without further hearing” for lack of valid documents or for fraud); INA § 235(c), 8 U.S.C. § 1225(c) (directing immigration officers to "order the alien removed” if suspected of being inadmissible under security threat grounds, and report the order to the Attorney General who will decide whether to provide a hearing); INA § 238, 8 U.S.C. § 1228 (directing the Attorney General to institute expedited removal procedures-either by an immigration judge or officer — for aliens convicted of aggravated felonies).

. Or, in the words of Judge Fernandez, "An objective observer would have asked, as Congress did, just what was the purpose of all of that procedure, all of those punctilious niceties, which can take years to complete, if the person could just step back into the country a few days later and have the roundelay go on?” Castro-Cortez, 239 F.3d at 1054 (Fernandez, J., dissenting).

. Congress first instituted reinstatement in 1950, but only for certain immigrants (e.g., "subversives” and "anarchists”). Fernandez-Vargas v. Gonzales, -U.S. -, 126 S.Ct. 2422, 2425-26, 165 L.Ed.2d 323 (2006) (citing Internal Security Act of 1950, § 23, 64 Stat. 1012). The INA, passed in 1952, broadened the reinstatement provision to apply to a somewhat larger class of aliens, those deported for engaging in certain unlawful activities — e.g., smuggling, marriage fraud, crimes of moral turpitude, multiple criminal convictions, aggravated felonies, illegal drug use or dealing, and terrorism activities. See INA § 242, 8 U.S.C. § 1252 (repealed 1996).

. Similarly, a removal order cannot be reinstated under 8 C.F.R. § 241.8 if the alien raises either (1) an unresolved adjustment of status claim under the Haitian Refugee Immigrant Fairness Act of 1998 or the Nicaraguan Adjustment and Central American Relief Act, or (2) an asylum claim. See 8 C.F.R. § 241.8(d)-(e). If the alien raises an adjustment of status claim under either of these statutes, "[t]he immigration officer may not reinstate the prior order in accordance with this section unless and until a final decision to deny the application for adjustment has been made.” 8 C.F.R. § 241.8(d). Likewise, if the alien "expresses a fear of returning to the country designated in that order, the alien shall be immediately referred to an asylum officer for an interview to determine whether the alien has a reasonable fear of persecution or torture.” 8 C.F.R. § 241.8(e); see also Fernandez-Vargas, 126 S.Ct. at 2426 n. 4 (same). If the asylum officer determines that the fear is reasonable, he must refer the matter to an immigration judge "for full consideration of the request for withholding of removal.” 8 C.F.R. § 208.31(e).

. The INA does have a procedure an alien may use to reopen an in absentia removal order based on a claim of lack of notice, see INA § 240(b)(5)(C)(ii), 8 U.S.C. § 1229a(b)(5)(C)(ii), but Morales has failed to avail himself of it.

. Any mode of departure — voluntary or involuntary — while subject to an order of removal constitutes a removal for reinstatement purposes. See INA § 241(a)(5), 8 U.S.C. § 1231(a)(5) (ordering the Attorney General to reinstate a removal order if "an alien has reentered the United States illegally after having been removed or having departed voluntarily [while] under an order of removal”).

. Morales' wife filed an 1-130 alien relative petition, concurrently with Morales’ 1-485 application to adjust status, in March 2001. Morales, however, was unlawfully present in the United States for more than a year before removal and then reentered illegally. Consequently, he is inadmissible for ten years since his last departure from the United States. See INA § 212(a)(9)(C), 8 U.S.C. § 1182(a)(9)(C).
As an inadmissible alien seeking adjustment of status, he needed to file an 1-212 petition for a discretionary waiver before he could apply for reentry. INA § 245(i), 8 U.S.C. § 1255(i); 8 C.F.R. § 212.2(e). He didn’t do so before the prior removal order was reinstated, so he "is not eligible and may not apply for any relief.” INA § 241(a)(5), 8 U.S.C. § 1231(a)(5); Padilla, 334 F.3d at 925 (holding that reinstatement bars all relief, including relief under INA § 245 (i)); cf. Perez-Gonzalez v. Ashcroft, 379 F.3d 783, 788 (9th Cir.2004) ("Given the fact that Perez-Gonzalez applied for the waiver before his deportation order was reinstated, he was not yet subject to its terms and, therefore, was not barred from applying for relief.”).

. The Supreme Court held that the reinstatement provision has no impermissible retroactive effect in Fernandez-Vargas, 126 S.Ct. at 2434, so the officers did not err in reinstating pre-1996 removal orders.

. See also Perez-Gonzalez, 379 F.3d at 796 (addressing the harm “on narrower grounds than due process”); Padilla, 334 F.3d at 924 ("[W]e still need not decide whether the INS’s regulation offends due processBut see United States v. Luna-Madellaga, 315 F.3d 1224, 1226-27 (9th Cir.2003) ("[A]n alien who illegally reenters the United States while under an order of removal has already received a full and fair hearing .... ”); Alvaren-ga-Villalobos v. Ashcroft, 271 F.3d 1169, 1173, 1174 (9th Cir.2001) (“[Ajliens removable under § 241(a)(5) have already received all of the process that is due under the Constitution.” "To preclude a second bite at the apple after an illegal reentry does not offend due process.”).